ROBERT R. LIVINGSTON AND ROBERT FULTON,     *Appellants,*

*against*

JAMES VAN INGEN, H. BOYD AND TWENTY OTHERS,     *Respondents.*

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

THE appellants filed their bill against the respondents, in the court of chancery, on the 14th of *September*, 1811. The bill stated:

That on the 19th of *March*, 1787, the legislature of the state of *New-York* passed an act, entitled " An act for granting and securing to *John Fitch* the sole right and advantage of making and employing for a limited time, the steam-boat by him lately invented;" which act recited: That whereas *John Fitch*, of *Bucks* county, in the state of *Pennsylvania*, had represented to the legislature of this state, *that he had constructed an easy and expeditious method of impelling boats through the water, by the force of steam;* and praying that an act might be passed, granting to him, his executors, administrators and assigns, the sole and exclusive right of making, employing and navigating, all boats impelled by the force of steam or fire: Wherefore, in order to promote and encourage so useful an improvement, it was, by the same act, enacted, that the said *John Fitch*, his heirs, administrators and assigns, should be, and they were thereby vested *with the sole and exclusive right and privilege of constructing, making, using, employing and navigating, all and every species or kinds of boats, or water craft, which might be urged or impelled through the water, by the force of fire or steam, in all creeks, rivers, bays and waters whatsoever, within the territory and jurisdiction of this state, for* and during the full end and term of *four-teen years* from and after the then present session of the legislature; that if any person or persons whomsoever, without being properly authorized by him the said *John Fitch*, his heirs, executors or administrators, should make, use, employ or navigate, any boat or water craft, which should or might be urged, impelled, forced or driven through the water, by the force, power or agency, of fire or steam, as aforesaid, within the territory or jurisdiction of this state, every person so offending against the tenor, true intent and meaning of the said act, for each and every such offence *should forfeit* and pay unto the said *John Fitch*, his heirs,

The several acts of the legislature of the 27th March, 1798, (sess. 21. c. 55.) of the 5th April, 1803, (sess. 26. c. 94.) of the 6th April, 1807, (sess. 30. c. 165.) of the 11th April, 1808, (sess. 31. c. 225.) and of the 9th April, 1811, (sess. 34. c. 200.) granting and securing the sole and exclusive right of using and navigating boats by steam, &c. in the waters of this state, to certain persons therein named, for a certain term of years, are constitutional and valid; and the party in possession of the right, under those statutes, is entitled to an injunction, to restrain others from infringing that right; altho' the statute declared that the boats, &c. used in violation of the right of the grantees should be *forfeited* to them; and an action of *detinue* was brought by virtue of the act, to recover the boats, &c. so forfeited to the grantees.

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

executors or administrators, or to such other person or persons, as he, his heirs or assigns, should authorize and empower, for that purpose, *the sum of one hundred pounds, to be recovered by action of debt, in any court of record within the state wherein the same might be cognisable, with costs of suit;* and should also *forfeit to him,* the said *John Fitch,* his heirs or assigns, *all such boats or water craft, together with the steam engine, and all the appurtenances thereof,* to be *recovered in manner aforesaid, with costs-of suit.* That neither the said act, nor any clause, matter or thing therein contained, should be taken, deemed or construed, to prohibit or prevent any person or persons from making, using, employing or navigating within this state, any kind of boat or water craft, theretofore invented, or thereafter to be invented, on any other principles, construction or mode, which might be urged, impelled, or driven along through the water by any other power, force, agency or means, except fire or steam :

That *Robert R. Livingston* having bestowed much time and attention on the subject of applying the force of fire and steam to the purposes of navigation ; and, after a variety of experiments, made at a very great expense, ascertained, as he conceived, a mode of applying the steam engine to propel a boat on new and advantageous principles ; but being unwilling to run the risk and hazard of making a practical experiment of his plans, which could not be done but at a very great expense, unless he was encouraged to do so, by having an exclusive right and privilege secured to him by law, in case his plan should be found to answer his expectations, represented to the legislature his willingness and desire to incur the expense of an experiment which might prove so useful and beneficial to the community, if the legislature would guaranty to him such an exclusive privilege as, in the event of such success in his experiments, should be some remuneration for his hazard and expense, and some compensation as an equivalent for the benefit that would result to the public from his efforts on that subject:

That notwithstanding the above-mentioned law passed in favour of *John Fitch,* he never, to the knowledge or belief of the appellants, made any attempt to employ or navigate, on any of the waters of this state, any kind of boat or craft, urged or impelled through the water by the force of fire or steam, or in any manner to avail himself of the privilege granted to him by the law :

That in consequence of the above-mentioned representation

made to the legislature of this state, and of the failure of *John* *IN ERROR.*
ALBANY,
March, 1812.
LIVINGSTON
v.
VAN INGEN. *Fitch* to employ or navigate on any of the waters of this state, any kind of boat, urged or impelled through the water by the force of fire or steam, or in any manner to avail himself of the privilege granted to him, as aforesaid : and the proposed experiment of *Robert R. Livingston* appearing to the legislature of this state to be laudable, and deserving of encouragement, a law was passed by the legislature, on the 27th of *March,* 1798, entitled "An act repealing an act, entitled 'An act for granting and secu-ring to *John Fitch* the sole right and advantage of making and employing the steam-boat by him lately invented, and for other purposes;'" which act recited, "that whereas it had been sug-gested to the people of this state, represented in senate and assem-bly, *that Robert R. Livingston was the possessor of a mode of applying the steam engine, to propel a boat on new and advanta-geous principles;* but that he was deterred from carrying the same into effect, by the existence of the law first above mention-ed, as well as by the uncertainty and hazard of a very expensive experiment, unless he could be assured of the exclusive advantage of the same, if on trial it should be found to succeed;" and fur-ther reciting, " that whereas, it was further suggested, that *John Fitch* was either dead or had withdrawn himself from this state, without having made any attempt, in the space of more than ten years, of executing the plan for which he so obtained the exclu-sive privilege, whereby the same was justly forfeited;" it was, therefore, enacted, that the act first above mentioned should be, and was thereby, repealed; and to the end that *Robert R. Liv-ingston* might be induced to proceed in an experiment which, if successful, promised important advantages to the state, it was, in and by the same act, further enacted, that privileges similar to those granted to *John Fitch* in and by the act before first men-tioned, should be, and were, thereby extended to *Robert R. Liv-ingston,* for the term of *twenty years* from the passing of the act of the 27th of *March,* 1798 : Provided, nevertheless, that *Robert R. Livingston* should, within twelve months from the pass-ing of the act, give such proof as should satisfy the governor, the lieutenant-governor and the surveyor-general of this state, or a ma-jority of them, of his having built a boat of at least twenty tons' capa-city, which should be propelled by steam, and the mean of whose progress through the water, with and against the ordinary current of the *Hudson's* river, taken together, should not be less than four

miles an hour, and should, at no time, omit, for the space of one year, to have a boat of such construction plying between the cities of *New-York* and *Albany :*

That from the time of the passing of the last-mentioned act, until the month of *April,* 1803, *Robert R. Livingston* was engaged in efforts to accomplish the object specified in the last-mentioned act, and for that purpose had made divers experiments, at a very great expense, which, though they proved ineffectual, convinced him of the practicability of his scheme: and that *Robert Fulton* having also, for a length of time, turned his attention to the same subject, and made many efforts and experiments to accomplish the same object; and having discovered certain principles and improvements for the application of the steam engine to the purpose of navigation; and the appellants having agreed to combine their efforts to apply the power of steam to propelling boats, and their interests in what might be the result of their endeavours; the appellants, about the time last mentioned, caused to be made an application to the legislature of this state, in consequence of which, the legislature, on the 5th of *April,* 1803, passed a law, entitled "An act relative to a steam-boat." By which it was enacted, that the rights, privileges and advantages granted to *Robert R. Livingston,* in and by an act, entitled "An act repealing an act for granting and securing to *John Fitch* the sole right and advantage of making and employing the steam-boat, by him lately invented, and for other purposes," passed the 27th of *March,* 1798, should be extended to *Robert R. Livingston* and *Robert Fulton,* for the term of twenty years from the passing of the act of the 5th of *April,* 1803; that the term for giving the necessary proof of the practicability of a boat of twenty tons' capacity, being propelled by steam through the water, with and against the ordinary current of *Hudson's* river, taken together, four miles an hour, should be, and the same was, thereby extended to two years from the passing of that act :"

That by a law, passed on the 6th of *April,* 1807, entitled "An act to revive an act, entitled ' An act relative to a steam-boat,' it was enacted, that the act entitled ' An act relative to a steam-boat,' " passed the 5th of *April,* 1803, should be, and the same was thereby extended for the term of two years, from the 6th of *April,* 1807, to exhibit the proofs required by the act, passed on the 5th of *April,* 1803:

That within two years from the passing of the last-mention-

ed act, and previously to the month of *April*, 1808, the appel-
lants, by their joint efforts, and at their joint expense, built a boat
of more than twenty tons' capacity, which was propelled by steam
through the water, with and against the ordinary current of *Hud-*
*son's* river, taken together, more than four miles an hour;
which boat had ever since been constantly plying (except when
the navigation of the river was interrupted by ice) between
the cities of *New-York* and *Albany*, and that the appellants
did give such proofs as satisfied the governor, the lieutenant-
governor and the surveyor-general of this state, or a majority
of them, that the appellants had built a boat of at least twenty
tons' capacity, which was propelled by steam, and the mean of
whose progress through the water, with and against the current of
*Hudson's* river, taken together, was not less than four miles an
hour, as by the before-mentioned laws was required : as by a certi-
ficate, under the hands of *Daniel D. Tompkins*, Governor, *John*
*Broome*, Lieutenant-Governor, and *Simeon De Witt*, Surveyor-
General, bearing date the 28th of *July*, 1808, in the possession
of the appellants, might appear :

That the appellants having established their boat, as afore-
said, by a law, passed on the 11th of *April*, 1808, entitled " An
act for the further encouragement of steam-boats in the waters of
this state, and for other purposes," it was, among other things,
enacted, that whenever *Robert R. Livingston* and *Robert Fulton*,
and such persons as they may associate with them, should esta-
blish one or more steam-boats or vessels, other than that then al-
ready established, they should, for each and every such additional
boat, be entitled to five years' prolongation of their grant or
contract with this state : Provided, nevertheless, that the whole
term of their exclusive privileges should not exceed thirty years
after the passing of that act ; that no person or persons, without
the license of the persons entitled to the exclusive right to navi-
gate the waters of this state by boats moved by steam or fire, or
those holding a major part of the interest of such privilege, should
set in motion, or navigate, upon the waters of this state, or within
the jurisdiction thereof, any boat or vessel moved by steam or fire ;
and the person or persons so navigating with boats or vessels mo-
ved by steam or fire, in contravention of the exclusive right of
the appellants, and their associates and legal representatives,
*should forfeit such boat or boats and vessels, together with the en-*

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

gines, *tackle and apparel thereof, to the appellants and their asso-ciates :*

That the appellants, having, in all respects, complied with, and fulfilled, the terms and conditions expressed in the before-mentioned laws, *became entitled to the exclusive right and privilege to navigate the waters of this state by boats moved by steam or fire :*

That the appellants have ever since held, and yet hold, and were entitled to all such exclusive right or privilege, having never parted with or assigned any part of the same, nor had they any associates in that business ; and well hoped that they would be left in the uninterrupted enjoyment of their exclusive right and privilege, the more especially, as the same was considered by the legislature of this state, as well as by the appellants, as a contract with the people of this state, the benefit of which they were to enjoy, as a consideration for their exertions in establishing so useful an improvement in the art of navigation, for the hazard they had run in making their experiments, and for the great sums of money which they expended in carrying their plans into successful operation :

That the respondents, in contravention of the grant, or contract, made to and with the appellants, and the exclusive right or privilege to navigate the waters of this state with boats moved by steam or fire, vested in the appellants, without any license from the appellants, had set in motion in the waters of this state, and within the jurisdiction thereof, that is to say, on the waters of the *Hudson's* river, a certain boat or vessel, moved by steam or fire, called the *Hope,* which boat had, for a long time past, been employed, and as the appellants believed, and as the respondents publicly avowed, was intended to be employed, in navigating and carrying passengers on *Hudson's* river, between the cities of *New-York* and *Albany ; whereby such boat or vessel, together with the engine, tackle and apparel thereof, had become forfeited to, and were then justly and rightfully the property of, the appellants :*

That the appellants had demanded the boat of the respondents, and required them to give her up to them, as being forfeited to and belonging to them ; but that the respondents had refused so to do, insisting upon holding the same, and on their right to navigate the waters of this state therewith :

That the respondents actually retained the possession of

1

the boat, and were employing her, against the will of the appellants, in carrying passengers for hire between the cities of *New-York* and *Albany*, and receiving, and appropriating to their own use, the emoluments arising from such unlawful use of such boat; pretending that no such laws as are above mentioned or recited have been passed; or, if they had been passed, that the appellants had not complied with the terms and conditions thereof.

IN ERROR.
......
ALBANY,
March, 1812.
LIVINGSTON
v.
VAN INGEN.

The bill prayed that the respondents might be enjoined from using or employing the boat called the *Hope* in navigating the waters of this state, without the permission, and in contravention of the rights of the appellants; that the appellants might have such other and further relief as the nature of their case should require; and that process of *subpœna* should issue against the respondents.

On presenting the bill to the chancellor, he refused to grant the injunction, on the *ex parte* application of the appellants; but directed, on filing the bill, an order to be entered that the respondents show cause by the first day of the next term, why an injunction should not issue, according to the prayer of the appellants.

In consequence of this order, the respondents appeared in the court of chancery, at the *October* term, 1811, and, amongst other grounds, upon which an injunction was resisted, read in evidence an act of the legislature of this state, passed the 9th of *April*, 1811, entitled "An act for the more effectual enforcement of the provisions contained in an act, entitled 'An act for the further encouragement of steam-boats on the waters of this state, and for other purposes;'" whereby it is enacted, that the several forfeitures mentioned in the act, entitled "An act for the further encouragement of steams-boats on the waters of this state and for other purposes," passed the 11th *April*, 1808, shall be deemed to accrue on the day on which any boat or boats moved by steam or fire, not navigating under the license of *Robert R. Livingston* and *Robert Fulton*, their associates or assigns, shall navigate any of the waters of this state, or those within its jurisdiction, in contravention of the act; and that *Robert R. Livingston* and *Robert Fulton*, their associates and assigns, shall and may be entitled *to the same remedy, both in law and equity, for the recovery of the boat or engine, tackle and apparel, as if the same had been tortiously and wrongfully taken out of their possession:* That when any writ, suit or action is brought for the recovery of such forfeitures, the defendant or defendants to such writ, suit or action, the cap-

*IN ERROR.*
•••••
ALBANY,
March, 1812.
LIVINGSTON
v.
VAN INGEN.

tain, mariners and others employed in so navigating, in contraven-
tion of the law, shall be prohibited, by writ of injunction, from na-
vigating with or employing such boat or boats, engine or engines, or
from removing the same, or any part thereof, out of the jurisdiction
of the court, or to any other place than that which shall be direct-
ed for their safe keeping by the court, during the pendency of such
suits, action or actions, or after judgment shall be obtained, if such
judgment shall be against the defendants, or the master, or thing for-
feited : That when the plaintiffs shall elect to sue out an injunction,
the court granting the same shall impose upon them such rules as
may appear just and proper, to prevent unnecessary delays in bring-
ing such suit to issue and trial : *Provided always, that nothing in
that act should be deemed or construed to extend or apply to the
two boats or vessels, commonly called steam-boats, belonging to
Hamilton Boyd, Isaiah Townsend, Robert R. Henry, and their
associates,* or to the captain, mariners and others employed in na-
vigating the same, which boats or vessels were lately launched at
the city of *Albany,* nor to the steam-boat which, during the last
summer, plied on lake *Champlain,* said to belong to *James Wi-
nants* and his associates, or to the captain, mariners, or others
employed in navigating the same, but in regard to those three boats
or vessels, *Robert R. Livingston* and *Robert Fulton,* and their
associates or assigns should have and enjoy all the remedies
heretofore provided, in and by, or resulting from, any former law
or laws of this state, and the relative rights and remedies of the
respective parties, in relation to the three boats or vessels above
mentioned, should be and remain as if that act had not been
passed.

It was admitted, by the appellants' counsel, that an action of
*detinue* had been commenced, and was pending in the supreme
court of this state, before the filing of the appellants' bill, for the
recovery of the *Hope,* her tackle, apparel and furniture.

The parties having been heard by their counsel, his honour the
chancellor, on the 18th *November,* 1811, discharged the rule to
show cause, and denied the appellants' motion for an injunction;
and from the order for this purpose the present appeal was made
to this court.

The reasons for this decree were thus assigned by

THE CHANCELLOR.   An application was made by the com-
plainants in this cause, upon filing the bill, for an injunction to re-

strain the defendants from using a *steam-boat*, called the *Hope*, in the navigation of *Hudson's* river; on which an order was made, requiring the defendants to show cause why such an injunction should not be granted.

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

There are circumstances in this case which would have induced me to have availed myself of the aid of one of the judges of the supreme court, to decide on the important and novel questions which were presented, if the forms of the court, and the established modes of proceeding, had admitted of it; but that resort being beyond my reach, the duty imposed prescribed my line of conduct.

The parties were heard on the subject of this order; and, on the part of the defendants, it was objected that the complainants' claim to an exclusive navigation of steam-boats was,

1. Contrary to the constitution of the *United States;*

2. That the statute under which the complainants claim having prescribed a remedy for violations of the exclusive right, chancery must leave them to pursue it, without its interference.

The complainants applied for an injunction, on the ground of a clear exclusive right, granted to them by an act of the legislature of this state, secured and extended by several successive acts.

Prior to the adoption of the constitution of the *United States,* the respective states possessed an absolute sovereignty; but the exercise of some of their powers of sovereignty was devolved upon congress, by the legislatures of the particular states. The residuum remained unimpaired with the several states. The congress was undeniably a representation of federative states, and represented their sovereignty collectively, in their foreign relations and the domestic objects appropriately within those powers.

None of the restrictions imposed by the confederation could have been applied to the present case, but the 4th article, which in less comprehensive general terms, but more in detail than the new constitution, secured to the citizens of the *United States* common privileges and immunities.

The constitution, in the 8th section of the 1st article, confers on congress the power " to regulate commerce with foreign nations, and among the several states. To promote the progress of science and useful arts, by securing, for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries."

The 2d section of the 4th article declares, "that the citizens

*IN ERROR.*
••••••
ALBANY,
March, 1812.

LIVINGSTON
*v.*
VAN INGEN.

of each state shall be entitled to all the privileges and immunities of citizens of the several states."

The grant in question is not of the exclusive right of a propelling power applied to machinery of an ascertained construction; but is a grant of the propelling power at large, wherever it is possible to create it on the waters of the state, if applied to the purpose of navigating vessels.

There is, certainly, a manifest difference between a grant from the executive, a department of the government moving in its destined orbit, and one made by the legislature vested with the supreme power of regulating and disposing of the common property of the state, according to what it may conceive conducive to the general welfare and prosperity of the community.

How far the power of the legislature may be rightfully exercised, and that it has a right I hold unquestioned, as to appropriating, regulating and improving the navigable waters of the state, of every description, for public beneficial purposes, as for accommodation of commerce or navigation, was not a point in the range of my inquiry.

* 2 *Bl. Com.* 14.

That the elements of air and flowing water, are incapable of any other than a usufructuary property, is an elementary truth.* They can only be used during the time they are arrested and occupied, and the actual possession retained by such use. If they escape from the grasp of the occupant, or he abandons them, they return to the common stock, and every other man who can have access to them, has a right to enjoy them

† 2 *Bl. Com.* 18. *Brownl.* 142.

afterwards; for "water and air," says *Blackstone*,† "are moving things, and must of necessity continue in common, by the law of nature." Hence, by the *English* law, as well as the law of this state, an action cannot be maintained for a pond or rivulet, so many acres or cubic yards of water; but for the land at bottom, as so many acres of land covered with water; and by a grant of water nothing passes but a right of fishing.‡

‡ *Co. Litt.* 4.

Air is so much less susceptible of substantial, permanent ownership, that it is not even capable of being occupied for the ordinary purposes of life, other than by respiration or for ventilation, which require a free unrestrained circulation to adapt them to either. If confined within impervious limits, those must necessarily have been formed of matter capable of appropriation; but in that case, the materials of the enclosure constitute the line of property, without any relation to its evanescent contents.

Steam, as an elastic fluid composed of air and water, rarified

and expanded by the force of heat, partakes of both those elements, and has the volatile, elusive properties of both, in a higher degree. It requires an impenetrable substance to resist its escape, so as to separate it from the common air of the atmosphere. It is water expanded in greater space and in a subtler state of fluidity, than in its natural state, and, from its properties, less adapted to permanent appropriation than either of its constituent parts. Hence, it is to be inferred, that steam could not have been the subject of the grant, as property.

*IN ERROR.*

......

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

The vessel propelled could not be the subject of grant. Its dimensions and form must be adventitious. The complainants were to construct it, at their own expense, and the propelling power is a quality extrinsic and accidental.

If neither steam nor the vessel using it, could attach a right of this kind, its basis must be laid in the navigable waters of the state, and it became necessary to examine on what foundation it can rest there.

When *Justinian*, the Emperor of the *East*, devised his code of civil law, he acknowledged the source of the right to the common enjoyment of air and water to be paramount to his authority, and bestowed, as a common boon, by the hand of nature, or, as we would express the same sentiment, *by Nature's God;* an acknowledgment, from the situation of the legislator, from the occasion and manner of making it, calculated to impress the mind with its sincerity and truth, and that it was dictated by the general sense of mankind.

The civil code was, in its origin, merely municipal; but from the extent of country and population for which it was devised; from the great antiquity of its sources, from the amelioration which the experience, wisdom, and science of successive ages had infused, from the sound maxims of justice and jurisprudence it contained, from the able and learned jurists intrusted with its compilation, as well as its intrinsic worth, it has been deservedly held in reverence by all the civilized world, and in many *European* countries, is the avowed basis of their municipal laws; but, perhaps, in no one instance, is it entitled to more profound respect than for such formal disclaimer, and its motives, which the acknowledgment imports.

In the *Institutes** it is laid down, that those things which are given to mankind, in common, by the law of nature, are the air, running water, the sea, &c.

*Lib. 3. tit. 1. de aere, aqua profluente, &c.*

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.
* Just. Inst.
lib. 2. tit. 2.
De Flumini-
bus et Porti-
bus.

All rivers* and ports are public, and, therefore, the right of fishing in ports or rivers is in common; and herewith agrees *Domat*. (29. 398.)

The general principles applied to the sea, have as uniformly been extended to rivers in which the tide ebbs and flows, *as arms of the sea*. Those rivers flowing through territories which bind and confine them, contract their public use to the people of the states bordering on them; which, in practice, has been considered as a national occupancy, vesting in the people of those states the same enjoyment, as common to all, on a more contracted scale; but whether, when flowing through distinct sovereignties, they are at all susceptible of exclusive national appropriation, so as to exclude the nation most remote from the sea from a free access to it, has been a question of animated discussion both here and in *Europe*.

The common law doctrine is conformable to those principles; and is conceived in such terms, and to be traced to so early a day, as to warrant a presumption that it is derived from the civil law.

† *Bract.* lib. 1, c. 12. s. 6.

*Bracton*† is quoted by Sir *Matthew Hale*, in his *Treatise de Jure Maris*, &c. contained in *Hargrave's Law Tracts*, (83.) as to the common use of rivers and ports.

‡ *Davies's Rep.* 149. 1
*Mod.* 105. 6
*Mod.* 73. 1
*Salk.* 357. 4
*Burr.* 2164.
§ *Mag. Char.* c. 23.
** *Harg. Law Tracts*, 110.

That navigable rivers in which the tide ebbs and flows, are considered as arms of the sea, and, as it would seem, whether the waters were salt or fresh, was recognised in a number of cases;‡ and some traces of the jealousy with which they were guarded from obstruction are to be found as early as *magna charta*.§

The passage from *Hargrave*** was not quoted correctly by the counsel for the complainants, for he there speaks of *inland* rivers, which empty themselves *mediately* into the sea, to which different doctrines apply. In the case from 6 *Mod.* 73. *Holt* held that the king's grant could not bar a common right of fishing in a navigable river. But *Hale*, in his treatise, shows a number of cases in which a grant of that kind was held available, and that a subject might possess a franchise in a port; as customs arising from its use, or even the soil; and so is now the acknowledged doctrine; but though all these rights might exist in subjects, the *jus publicum* of passage and repassage was not thereby destroyed, and no annoyance or obstacle was to be tolerated to interrupt or incommode the navigation.

†† *Harg. Law Tracts*, 84.

*Hale*†† remarks, that when a *port* is fixed, though the soil, franchise or dominion thereof, *prima facie*, is in the king, or by deri-

IN ERROR.
......
ALBANY,
March, 1812.
LIVINGSTON
v.
VAN INGEN.

ration from him, in a subject, yet that the *jus privatum* is clothed and superinduced with a *jus publicum*, wherein both natives and foreigners, in peace with the kingdom, are interested, by reason of commerce, trade and intercourse; "and this public right consists, among other things, principally in that they ought to be free and open for subjects and foreigners, to come and go with their merchandise;" that "they ought to be preserved from impediments and nuisances that may hinder or annoy the access, abode or recess of ships," &c.

Navigable rivers, in which the tide ebbs and flows, are within the same reason, and subject to the same distinctions. They admit of private interests in them; but they must all be subservient to the public interest, to promote and protect which, in *England*, the king has a general conservancy; but whenever he makes a grant of the soil or franchise of a port, or of a navigable river, the legal construction is, that it must be in subserviency to the public rights, and the common use of all the subjects of the realm, and even of foreigners.

None of the books I have consulted on the subject, and none of those cited in argument, have shown a case in which a grant of a navigable river or port vested in the grantor a right to the exclusive enjoyment of its use. The construction of wharves and other lateral erections, calculated to give facility to commerce and navigation, and to promote public convenience, have been authorized, in numerous instances, by acts of parliament, in *Great Britain*, and by acts of the legislature here. The opening of waters not navigable, or such as were imperfectly so, have sometimes given rise to the imposition of tolls, both here and in *Great Britain*. But no exclusive right of navigating has been granted to particular persons, or to vessels of a particular construction, or possessing certain properties, in either country; and it would seem that it was considered contrary to the *jus publicum*, that such a grant should be made.

The erection of bridges, and the establishment of ferries, across navigable rivers, are modifications of the *jus publicum*. They are all directed to the same object, the accommodation and convenience of the public. They, however, have no foundation in the law of nature; they are the effects of the invention and labour of man.

If by the common law of *England*, navigable rivers, in which the tide ebbs and flows, were deemed consecrated to the common

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

use of all, as of common right, if no impediment or obstruction was to be admitted to impede the navigation, if a grant, which, by its terms, in all other cases, would have passed a fee, *usque ad cœlum*, was, by the established construction of law, to glance from the surface of a navigable river, or attach to its bottom, and give only an exclusive right to the grantee, to catch the swimming fish, while within the bounds of his grant, if the common law was the law of all the states in the union, at the time the constitution was adopted, as it certainly was in this, it may be a question of very serious import, how far a particular state may detract from privileges and immunities, at common law incapable of annihilation or restraint, common to all, at the time the constitution was adopted, and regulated by principles which shielded them from every species of private appropriation.

The claim of the complainants is not founded on original invention. The mode of generating steam and its properties, were known as early as the seventeenth century; a patent for a steam-engine was granted in *England*, late in that century. Projects for propelling boats by steam have been under the public eye for near twenty-five years, as appears from the complainants' bill and the laws of the state, and the first act on the subject recognises the invention of a steam-boat by *John Fitch*. The combination of machinery, and the application of the power to give it effect, have been happily adapted to the propelling of vessels. It is a matter of public notoriety that they are now in a train of successful operation; and whenever the exertion of the ingenuity and perseverance which perfected them to the point at which they have now arrived, can become the legitimate object of judicial cognisance, the incalculable utility and convenience which the public experience from the invention, merit every consideration in favour of the inventors, which a court can possibly yield to, consistent with the correct administration of justice; but here they were not brought into view, and could have no weight.

The laws of the state alluded to have granted the exclusive right of using vessels impelled by steam, in the navigable waters of this state, to the complainants. Suppose this grant valid; if the legislature of this state could make an exclusive grant of that nature, could they not have extended it to vessels impelled *by the winds* or *by oars*, and to vessels of every other description, capable of floating? If they cannot, where is the line of distinction to be drawn between what has been granted, and what is un-

susceptible of grant? If carried to this extent, would it not be an abridgment of common rights? ˙ Could it comport with the constitutional provision, that the citizens of all the states are to have like privileges and immunities with the citizens of the several states? With whom are they to be ranked? With the class who hold exclusive rights in the state, or with the excluded class of citizens? If the most favoured citizens are not to give the test, what proportion of the collective number of the citizens of this state are to constitute it? If a numerical calculation is to be admitted, are a tenth, a hundredth or a thousandth part to afford such test? Would it consist with the intent of the constitution of the *United States*, that any portion of the citizens of an individual state, described by their age, their occupations, or estates, should have the exclusive right of using the navigable waters of such state? Can the constitution be so construed as to give rights to the citizens of all the states, superior to the rights of that state in which they are to be exercised? Or was the second section of the fourth article intended to secure equal rights to all? And should the grant in this case partake of the nature of a contract, could its consideration be legally carved out of the *jus publicum* of the citizens of the *United States?*

These are questions which, at the first blush, must appear of much moment; certainly too much so to admit of being determined without the fullest investigation. *Without meaning to decide upon any*, the mere propounding them must carry conviction to every mind, that the subject is involved in much doubt and difficulty, and that, from its novelty, its importance and perplexity, it constitutes a case incapable of being considered so clear and plain as not to admit of doubt, which is the only ground upon which an injunction could have been then granted on the bill of the complainants.

The acts recited in the complainants' bill show that the grant under which they claim, and the penalty prescribed for violating their exclusive right, were coeval; the same act which granted the one having created the other. There was no pre-existing common law right, at the time those acts were passed to which the statute remedy might be deemed accumulative.

The authorities cited to this point were chiefly criminal cases; but the analogy between those and civil cases is strong, and so recognised in some of the cases as to this point; and I inclined to the opinion that the sanctions prescribed by the acts could not be exceeded. The first point, however, operating against the granting an

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

*IN ERROR.*
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.
* 3 *Ves.* jun. 140.
† 14 *Ves.* jun. 130.

injunction, it cannot be useful to enter into a particular examination of this; nor could the possession relied on be of any avail to the complainants, on their motion; their title being set forth and appearing doubtful, which was not the case in *Bolton* v. *Bull**\* and *Harmer* v. *Plane,*† adjudged since the revolution, and much relied on in argument. Both those cases arose on conflicting claims between original inventors and claimants under patents for improvements. The patents were admitted. In the first case, the patentees had been in possession, for 27 years, of their patent rights. In the latter, it would seem, from Lord *Eldon's* opinion, that the possession under colour of the patent had been so reasonably long and undisputed, as to be deemed an evidence that the public had acquiesced in the enjoyment of the right. But in this case the validity of the original grant on which the possession is to be bottomed was the object of controversy.

A number of other points were made, and some of them argued with the greatest zeal and ability; but they did not come within the range of my opinion. They were disregarded, because a decision on them could not have altered the result; and I thought this a case in which it was highly expedient that every question not indispensably necessary to be determined upon, in order to dispose of the motion, should be left for ulterior consideration, if the prosecution of the bill should require further judicial investigation.

Upon the whole, I was clearly of opinion that this was a case in which an injunction ought not to be granted, in that stage of the cause, and that the complainants should take nothing by their motion.

The counsel for the appellants stated that they should contend that the order of the chancellor ought to be reversed; because,

That by the laws of the state, the appellants are invested with an exclusive right to navigate the waters of this state, by steam; and that they are entitled to the interposition of the court of chancery to restrain the respondents, who are violating that right:

That by one of those laws, passed in the year 1808, any boat violating their right becomes forfeited to the appellants, and they are, therefore, entitled to an injunction:

That the steam-boat called the *Hope*, employed by the respondents, and mentioned in the bill, in consequence of the forfeiture, is the property of the appellants; and the appellants have, therefore, the same right to the interposition of the court of chancery, to restrain the respondents from the use of it, that they would

have a right to the like interposition in case the respondents were
in possession of any other property of the appellants, and were
using it, to the prejudice of the appellants, as well as from the wear
and danger to which the boat is liable, while it is permitted to
navigate :

3. That in every government there must be a supreme or sovereign power, which has the entire authority of shutting up and regulating rivers and roads. This supreme power has never been ceded to congress, and must, therefore, of course, remain in the state, which alone is the judge of the expediency of exercising it :

4. That the waters within the territory of the respective states are the property of the states, and that the legislature of this state has as great power over its territory as an individual has over his property ; and has as much right to regulate or restrain the use of an invention, in the territory of the state, as an individual would have to prohibit the use on his own property :

5. That the grant to the appellants is a solemn contract made between them and the state, by which the state, for a valuable consideration, bound themselves to give the appellants the exclusive privilege which they claim. The appellants have faithfully performed the contract on their part, at very great expense and hazard, and are, therefore, entitled to the benefit promised them by the state :

6. That the subject of their grant or contract, with the state, is such as is capable of being granted, or respecting which a contract may be made :

7. That even were it possible to suppose the title doubtful, still, according to the invariable practice of the court, the appellants are entitled to an injunction, to quiet a possession taken by virtue of a statute, (or, indeed, of any matter of record,) till by a trial at law, or an issue directed by the court of equity, the opinion of the judges is had thereon :

8. That the rule in equity is to protect a possession, held even without a title, till a better right is shown, by a trial at law, if the possession has been for three years or upwards ; a title being, in such case, presumed :

9. That in the case of the appellants, their title under the law is not disputed by the court or the parties, but the doubt raised by the chancellor is on the validity of the laws, or the right of the

state to make the same. The possession, in such case, must revert back to the time when the state first exercised the right to grant exclusive privileges, in its waters, of a similar nature, which, (without noticing other exercises of this power, at a very early date,) but confining it to steam-boats, is as far back as the grant to *John Fitch*, a period of such length as would protect a possession, even at law, against an ejectment, and entitle any possessor to an injunction on the mere possession :

10. Because, even if the power of invalidating the right of the state lay with congress, or the citizens of other states, the defendants, being citizens of this state, could not avail themselves of this pretence for disturbing the possession of the appellants : neither the courts of law nor equity permitting the title of a stranger to be of any avail, except to those who deduce a title under such stranger :

11. Because, whatever may be the common law, relative to navigable waters, and the rights of citizens of other states therein, in virtue of the federal constitution, the law was altered in this state, and in several others, relative to steam-boats; the exclusive use of which was vested in *John Fitch*, before steam-boats were in existence for the common law to operate upon, and several months before the federal constitution was adopted :

12. Because, the court of chancery has founded its doubts upon an erroneous construction of the privileges supposed to be granted by the confederation, or the present federal constitution, to the citizens of the respective states, in the waters of the state, and which, even if correct, would not apply to the case of the defendants, who are citizens of this state :

13. Because the legislature represents the people of the state, as the constitution and the very style of the laws declare; that the defendants are, therefore, parties to the law, and have, as such, participated in the advantages, that both the law and the court of chancery declare have been derived to the people of the state, from the contract made in their behalf by their representatives, and have no right to nullify their own act : and upon this ground the appellants are entitled to the aid of the court of equity to enforce a specific pe rformance of their agreement :

14. Because the law forfeiting the boat, vests the property as soon as it has begun to navigate, and is a compensation for the *first offence only :* and for all subsequent injuries, by a continuance of the wrong, the appellants have no remedy but an injunction to stop the repetition of them :

15. Because, even if the appellants might recover damages at law, which is very doubtful, yet it could only be by a multiplicity of suits; (every trip of the boat affording ground for a new suit;) and it is the established practice of the courts of equity to grant injunctions in order to prevent a multiplicity of suits:

16. Because it is the practice of courts of equity to *prevent* damages, and not leave a party first to be injured, and then send him to seek a compensation at law:

17. Because it is the practice of the courts of equity to control the operation of forfeitures or penalties, where they do not make the object of the contract, but are held up *in terrorem,* and to inquire into the intention of the parties, and enforce the agreement according to such intention, and more particularly where the forfeiture is inadequate, or does not extend to the whole offence:

18. That an injunction, by the established law and practice of the courts of chancery, ought to be granted in each of the following cases; 1. Where the complainant has a clear legal right, or an equitable one, founded on the particular merits of his case; 2. When he claims by record, or under an act of the legislature; 3. Where, without an injunction, he might sustain an irreparable injury; 4. Where the party has been any time in the enjoyment of the right he claims; 5. Where he claims a specific remedy; 6. When the legal remedy is inadequate, if he has one; 7. Where he has no remedy at law but a multiplicity of suits; 8. Where the equity is clear, but the chancellor has doubts as to the legal title. In such case, it is the invariable rule to quiet the possession till the doubt is cleared up by an issue at law, under the direction of the court.

In the present case all these claims upon the court for an injunction are united. The appellants have a clear right: they claim under an act of the legislature: they sustain irreparable mischief, while their right is violated, and the boat, to which they are entitled, is withheld from them: they have been, for a length of time, in possession: they claim a specific performance of a contract: they require the aid of the court to prevent a multiplicity of suits: their equity is clear: they are, therefore, entitled to an injunction, till the chancellor's doubts are cleared up at law.

The respondents' counsel, on the other hand, stated that they should insist that the order of the chancellor ought to be affirmed:

1. Because, the acts of the legislature of this state, in favour of

*IN ERROR.*

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

the appellants, are repugnant to the constitution and laws of the *United States;* and, therefore, gave no right to the appellants, upon which the relief, or injunction sought by their bill, could be founded:

2. Because, admitting the validity of those acts, the appellants were not entitled to any other remedy than that prescribed by the legislature:

3. Because, if the injunction issues, and the appellants have no right to the exclusive privilege they claim, the respondents are without any redress for the injury they must necessarily sustain; whereas if the appellants have the right, they have a complete remedy against the respondents for whatever damages they may suffer by a violation of that right:

4. Because an injunction never ought to issue until the right of the party applying has been first settled at law, unless to prevent an irreparable mischief:

5. Because, in this case, the injunction will not prevent, but may create, an irreparable mischief.

*Hoffman,* (*Colden* and *Riggs,* on the same side,) for the appellants ; 1. This state has power to grant exclusive privileges, and particularly an exclusive right to navigate the waters within its jurisdiction. This power is inherent in every sovereign, and in every regular government; it is a power which may be most beneficially exercised for the promotion of industry, enterprise, commerce, science and the arts. *Canals, toll-bridges, turnpikes, ferries, public markets, &c.* are all exclusive privileges, which have always been granted, whenever the sovereign power of the state has thought them expedient. The expediency of granting them does not affect the right. It rests exclusively in the discretion of the legislature to grant or withhold the privilege. The *navigable waters* of the state do not limit the exercise of this power, nor can they, by any *public law,* as has been suggested, control the sovereignty of the state. Lord *Hale,* in the treatise published by *Hargrave,** admits that the parliament may control the *jus publicum,* as to navigable waters, though the *king* cannot.

Parliament, in *England,* may obstruct or destroy a port. So may the king erect a new port, and dissolve it. He may prohibit the entrance into certain navigable waters, unless *tolls, &c.* are paid. He may do many things in relation to ports and navigable waters ; but there are other things in relation to them which can

* *Harg. Law Tracts,* 60—67. 71—73.

only be done by act of parliament. The power of the king is limited, in this respect, but not that of the parliament. But even the king may do as much as has been done by the legislature in the present case. This state has sovereign power over all its territory, over the water as well as the land; and uniformly exercises equal power over both. The grant to the *Duke of York* includes the *Hudson* river, *eo nomine*, and the charter grants the *Hudson* by name. Under that grant one third of the property of the state is held. Our laws relative to the claim of *New-Jersey* are founded on the right derived under this grant. All the citizens of the *United States*, no doubt, are free to *use* the *Hudson*. They have a *usufructuary* right in that river; for it is a public highway;* but does not the legislature regulate highways, establish turnpikes and toll-bridges, so that they cannot be passed without paying such tolls, and conforming to the regulations established by the legislature? Exclusive privileges, as to driving public stages along certain roads, have been granted by the legislature;† and the citizens of other states as well as our own are compelled to submit to those regulations. The constitution of the *United States* (art. 4. s. 2.) provides only that the citizens of other states shall have equal privileges and immunities with our own. They can possess none other or greater. The state has exercised rights of property as well as jurisdiction over its waters. It, every day, grants land under the water of the *Hudson*, for wharves. One third of the city of *New-York* is built on land formerly covered by the *Hudson*. Grants of *ferries* are, *pro tanto*, exclusive grants of the water. The appellants claim only a usufructuary privilege; and that others should be prohibited from interfering with its exercise.

Air and *water* are free, but they are not to be used to the public injury; and the legislature may interfere to regulate their use, to prevent public injury, or to promote the public good. Is not the legislature, in this respect, omnipotent? Who can control it, unless by the provisions of the constitution? The *English* parliament is deemed omnipotent.‡ And the legislature is equally absolute and despotic, except where it is restrained by the constitution.

But it will be said that the acts in question are against the constitution of the *United States*, and, therefore, void. Every presumption is in favour of these acts, as they have been passed by different legislatures, from 1793 to the present time. A succession of legislatures, governors and chancellors have considered

*IN ERROR.*

......

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

* *Palmer* v.
*Mulligan*, 3
*Caines' Rep.*
307.

† *Sess.* 20. c.
70. *Sess.* 26. c.
20. *Sess.* 27. c.
37.

‡ 1 *Bl. Com.*
108, 109.

IN ERROR.
......
ALBANY,
March, 1812.
⌣⌣⌣⌣
LIVINGSTON
v.
VAN INGEN.

them constitutional; and the last act, of 1811, was passed, after the question as to the constitutionality of the other acts was agitated.

The power vested in congress " to regulate commerce with foreign nations, and among the several states," (art. 1. s. 8.) does not prohibit the regulation of internal commerce within the state. If it did, it would be equally applicable to the land as to water; and the legislature could not establish turnpikes, toll-bridges or ferries, &c. which might affect the commerce with neighbouring states. But if a certain description of waggons were required, for example, in the county of *Rensselaer*, would not the waggons coming from *Vermont* be bound to conform to the regulation? So a ferry across the *Hudson* may be established, which may require all travellers or passengers to cross in particular boats, and all persons must submit to the regulation.

The regulation of commerce with foreign nations means the establishing of duties of impost, tonnage, non-intercourse, embargoes, quarantine, &c. But there is nothing in the language of the constitution which gives this power exclusively to congress, in cases where it can be exercised concurrently with the states. Congress may prohibit the importation of slaves; and so may a state; and this state has prohibited their importation. The state cannot lay any duties on imports, or exports, or tonnage, because it is expressly prohibited. Vessels approaching our harbours from sea must submit to the laws of congress, relative to the custom-house; but when arrived within our jurisdiction, they are subject to our municipal law. Thus, the master of every foreign vessel is required, by statute, to report the passengers to the mayor of the city of *New-York*.

Again, congress has the power to promote the progress of science and the useful arts, by securing, for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries.

Why is not this a concurrent power with that of the several states? Before the adoption of the constitution, the states granted these exclusive privileges; and there is nothing in the constitution which prohibits the states from granting them now. By granting a patent, congress gives the exclusive right as to the whole *United States*, that is, the *right of property* in the invention or discovery, &c.; but not an unlimited and uncontrollable power to *use* that right. A mere naked right of property does not imply the unlimited power of using it. Its use must be subject to the laws and under the control of the several states. The legislature restrain the use or enjoyment of property in dogs and other animals. The pro-

perty of an individual may be taken for public purposes, without *in error.* his consent, as for roads, fortifications, &c. The interests and ...... policy of the different states may, and do, differ from each other. What may be deemed proper and beneficial in one state, may be thought improper and injurious in another. An author may secure a copyright in a book relative to negro slavery, the sale of which might not only be considered innocent, but meritorious in this state; while, in *Virginia*, it would be regarded as highly danger-ous, and of the most mischievous tendency; and could not the legislature of that state prohibit the sale of it? Has not the legis-lature a right to restrain or prohibit the sale of an obscene, immoral, or blasphemous book, or a noxious medicine, within this state, though the author or inventor may have secured an exclusive right in them, under the law of congress? An author, or a patentee, may acquire a right of property under the law of congress; but it must be used agreeably to the municipal laws of the several states.

Because, in certain *possible* cases, such state laws may infringe or impair patent rights, we are not to declare every law of the state, relative to exclusive rights, unconstitutional and void. It will be time enough to decide upon such supposed cases when they arise. Whenever a conflict occurs between one individual claiming under the state, and another claiming under a patent right, then the question of constitutionality may be properly discussed.

Every word of the constitution has its proper, precise and de-finite meaning. That instrument was framed by the wisest men, and with the greatest care. Every clause underwent discussion, and was subjected to the strictest and most jealous criticism.

It is, moreover, declared by the 10th article of the *amendments* to the constitution, that the powers not delegated to the *United States* by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.

Certain powers are expressly given to congress; others are ex-pressly given to the states.

All power not, in its own nature, *exclusively* vested in congress, or not expressly prohibited to the states, remains *concurrent* in the states. The 8th section enumerates the powers given to congress, and the 10th section those prohibited to the states. Some of the powers given to congress are necessarily exclusive; as to exercise jurisdiction over a certain district of ten miles square; to declare war; grant letters of marque and reprisal; borrow money on the credit of the *United States, &c.* Other powers are *concurrent,* as

ALBANY, March, 1812.

LIVINGSTON v. VAN INGEN.

*IN ERROR.*
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

* 2 *Dallas's*
*Rep.* 294.

to lay taxes; to punish counterfeiting the securities or coin of the United States, to punish certain offences against the law of nations, &c. The prohibitions to the states are a negation of the express powers before given to congress. To grant letters of marque and reprisal seems to be a power, in its nature, exclusive, and yet it is expressly prohibited to the states.

In *Collet* v. *Collet*\* it was decided by the circuit court of *Pennsylvania*, that the individual states had concurrent jurisdiction as to *naturalization*, provided the law of the state, for that purpose, did not contravene any rule established by the authority of congress. So the individual states may pass *bankrupt* laws, provided they do not interfere with the laws of congress. Congress has the power to lay and collect taxes, duties, imposts and excises; but the states are prohibited from laying duties on imports and exports. This state lays an excise, and duties on sales at auction.

The principle for which the appellants contend is of the greatest importance. It affords the only safe construction of the constitution of the *United States*, and is fortified and supported by the 10th amendment.

The power of granting patents or exclusive privileges not being, in its own nature, exclusive, nor *expressly* prohibited to the states, remains in the states, and may be concurrently exercised by them. But suppose the patent power in congress to be exclusive. On what is it to operate ? It is limited, in its application, to *authors* and *inventors*. There cannot be a patent for a thing before known. The object of the patent must be the patentee's own invention, otherwise, the patent is void. It is different in *England*, for there a patent may be granted to the importers of useful inventions and improvements. This is a *strict* power in congress, and cannot be extended. Congress cannot grant an exclusive privilege or monopoly. Suppose the art of making china or tapestry were to be brought into this state, and the encouragement of an exclusive privilege was requisite to induce the person to risk the expense and labour of establishing the manufactory : congress could not grant the privilege, because the art is already known; and the state cannot interfere, it is said, because it would be an infringement of the *jus publicum ;* or because, forsooth, hereafter, some person may obtain a patent from congress for some improvement in the machinery. And is the state to forego all the advantages to be de-

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

rived from works of great public utility, because there is a latent power in congress which may hereafter be exercised on the subject? There must be somewhere a *sovereign power* adequate to afford the requisite encouragement to such works. If it does not reside in congress, who can grant patents only, nor in the state, where does it reside? Can any portion of the sovereignty be in *abeyance?* The power does not remain in the people at large.

The appellants set up no right under a power granted by the constitution to congress. The bill exhibits nothing interfering with the powers granted to the *United States.* The appellants do not, in their bill, pretend to any invention or discovery; but merely that they *possessed* the means by which boats might be propelled by steam; and they ask only to be secured in the privilege of making the experiment. The right granted to *Fitch* was not a patent right. The language of the other act is, " to the end that *R. R. Livingston* may be induced to proceed with his experiment." The court are not to look or inquire beyond the facts stated in the bill. The act has all the properties of a grant of a *ferry,* except that it does not oblige any person to go in the boat. Whether the passage be up and down the river, or across it, it is the same, in effect. Sloops and other vessels are as free as ever to pass to and fro, and to carry as many passengers as they can obtain. The steam-boats of the appellants merely claim the advantages of superior accommodation and greater speed. After great hazard, and immense expense, the experiment has fully succeeded; and it is that success which has given rise to the present controversy. The appellants have endured all the ridicule and contempt cast upon them, as rash and chimerical projectors; and now when they are just about to reap the fruits of their enterprise, the respondents seek to deprive them of the honour and profit of the establishment.

The argument of the respondents is, that a patent *may* be granted with which the act would interfere. But the respondents cannot obtain a patent for their boats, for they are not the inventors. And when the constitutional question does arise, the patentee may show his right, and the act, so far as it interferes with the patent, must yield; but it will still be in force so far as it does not interfere with the patent right.

No *answer* has been put in to the bill. Suppose an answer should be filed, stating that the appellants are not the inventors, but had borrowed this improvement. The question as to the con-

*IN ERROR.*

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

stitutionality of the state law could not then arise, for the fact of invention is not alleged in the bill.

But the legislature most clearly had a right to pass the law, for congress had not the power to grant a patent or exclusive privilege in this case.

2. Then, is not the writ of injunction the proper remedy for the appellants?

Before the reign of *James* I. the King of *Great Britain* claimed the right, by royal prerogative, to create and secure exclusive rights and privileges. The parliament, however, denied and resisted the royal claim to create franchises and monopolies. This power had been exercised by *Elizabeth* and her successors, to a great extent; but by an act of parliament passed in the 21 *James* I. c. 3. all monopolies, grants, letters patent, &c. for the exclusive selling, &c. were declared void, with certain exceptions, among which are patents to first inventors, for the term of 14 years.[*] This statute gives the monopoly to the first inventor, though the thing had been before known or practised beyond sea. But the act of congress is confined to the inventions of the patentees themselves.

The statute of 8 *Ann.* c. 19. first secured to authors and their assigns, the sole right of printing and reprinting their works, during the period of 14 years;[†] and any person printing the book, without the consent of the author, forfeited the books, and one penny for each sheet in his custody. The statutes of 8 *Geo.* II. c. 13. 7 *Geo.* III. c. 38. and 17 *Geo.* III. c. 57. extended the same privilege to the inventors of prints and engravings.[‡] The act of congress, passed the 31st of *May,* 1790, is almost a transcript of the statute of *Anne.* The books printed in violation of the author's right are forfeited to him, and he may destroy them; it also gives the penalty of 50 cents for every printed sheet.

As to rights flowing from the mere exercise of *prerogative,* injunctions, in *England,* have been refused, in the first instance. This proceeded from that jealousy of the royal prerogative, which still existed, as in the reign of *James* I. Yet injunctions have sometimes been granted by chancellors favourable to the crown; or in cases of franchises, markets, books, &c. But since the statute of *James* I. there is not a case to be found, in which an injunction has been refused, in the first instance, to protect the statute right: nor is there an instance of such refusal to protect authors under the statute of *Anne.* Injunctions as to *prerogative*

[*] 4 *Bac. Abr.* 766. tit. *Monopoly.*

[†] 2 *Atk.* 141.

[‡] 2 *Atk.* 94.

rights, have sometimes been granted and sometimes refused; but
there is no case where they have been refused as to *statute rights.*
Though the *English* courts are jealous of the *crown*, yet where the
rights flowed from *parliament*, courts have uniformly and promptly
supported them.

The *anonymous* case, 1 *Vernon*, 120. was that of a prerogative
right. The application was made by the patentees of the king,
to stop the sale of bibles printed abroad; and a trial at law was
first ordered. The case of the *East-India Company* v. *Sandys** *
arose under the *East-India Company's* charter, which was a royal
patent. The defendant was an interloper, and the chancellor refused
the injunction. In *Hills* v. *University of Oxford*,† the plaintiffs
were *king's* printers, under patents from the crown, and claimed
against the university, to whom a patent had been granted in the
8 *Charles* I. for printing bibles, and other books not prohibited.
The injunction was refused, and the matter sent to be tried at
law, between the royal patentees. The *anonymous* case, in 1750,
(1 *Vesey*, 477.) arose on a franchise of a ferry, and the dis-
tinction for which we contend is there adopted by the lord chan-
cellor, that where the right is grounded on an act of parliament,
an injunction will issue on the filing the bill; but in special cases
of rights derived from the royal prerogative, no injunction issues
until the answer comes in, or the right appears by record to the
court. Lord *Redesdale*,‡ in his *Treatise on Pleadings in Chan-*
*cery*, states the rule to be, that in cases of this sort, it is not ne-
cessary to establish a right at law before filing a bill for an injunc-
tion, where the right appears on record, as under letters patent,
for a new invention, which is by virtue of the act of *James* I.;
or in cases of bills brought by authors or their assignees,
to restrain a sale of books, where the right, which is the foun-
dation of the bill, is grounded on an act of parliament. If the par-
ty who has got his patent, puts his invention in execution, it is
considered as a possession under it, however doubtful it may be
whether the patent can be sustained; and the court say, that
possession under colour of a title is ground enough for an injunc-
tion.§ The statute grant is to be presumed valid, until impeached.
Courts must act on that presumption. The party stands on that
ground until he is removed. The burden of proof against his
title to the possession, lies on the intruder. While doubts only
are entertained, and while the party is attacked in his possession,
he ought to be protected in that possession, until those doubts are

*IN ERROR.*
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

* 1 *Vern.* 127.

† 1 *Vern.* 275.

‡ *Mitf. Pl.* 129. *Coop. Eq. Pl.* 150.—157.

§ 6 *Ves.* 707.

*IN ERROR.*

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

* 2 *Dick.* 442.
455.

† 2 *Dick.* 647.

‡ 3 *Ves.* 140.

§ 2 *H. Bl.* 463.
See 8 *Term
Rep.* 95.

¶ 14 *Ves.* 130.

removed by legal investigation, and the truth established. The appellants do not ask to have their right established. It is for the respondents to shake or destroy it. Until this is done, they cannot disturb the appellants in the enjoyment of an express legislative grant.

In *Doolittle* v. *Walton*, *Smith* v. *Clarke*, and *Goodman* v. *Gallatin*,* Lord *Bathurst* lays it down, that to prevent waste, working of mines, ploughing ancient meadows, printing books, and exercising new inventions, injunctions are granted, as of course, before an appearance or answer. In *Hicks* v. *Raincock*,† a bill for an injunction to stay the infringement of a patent right was demurred to, on the ground that the plaintiff had not established his right at law; and Lord *Bathurst* overruled the demurrer. The case of *Bolton* v. *Bull*‡ is strong in point, on this principle. *Bolton & Watts* had obtained a patent for a *steam* engine, of which they had been in possession many years; and on filing a bill, an injunction was granted to restrain the defendant from infringing the patent, until its validity should be tried at law. In the court of common pleas,§ a verdict was taken for the plaintiffs, subject to the opinion of the court, and the judges were equally divided in opinion. The chancellor, nevertheless, continued the injunction, saying he would not put the plaintiffs to the acceptance of terms; nor put them out of the possession of their right, because the judges in the court at law had differed in opinion upon it. In the present case, to deny the injunction is to put the party out of possession, for their right is an entire and exclusive possession.

In *Harmer* v. *Plane*,¶ though considerable doubts were entertained as to the validity of the patent, on account of some defect in the specification of the improvement, yet the chancellor granted an injunction until the question on the patent should be tried at law. He said " that the question was not really between the parties on the record; for unless the injunction was granted, any person might violate the patent; and the consequence would be, that the patentee would be ruined by litigation." This course of proceeding is just and reasonable, and most conducive to the public good. If injunctions are not granted, in the first instance, patent rights would be useless; for few persons could endure to be deprived of their inventions, and, at the same time, bear the expense of endless litigation with all the world. Let those who set up a right in opposition first establish it, before they attack that of

IN ERROR.
••••••
ALBANY,
March, 1812.
LIVINGSTON
v.
VAN INGEN.

others. The precedent to be set in this case concerns not the plaintiffs only. It will affect the cause of genius throughout the United States. Genius and poverty are too often allied; and what poor individual would dare to encounter the charge of resisting the powerful combination of interested men.

In *Gibbs* v. *Cole*,* Lord Chancellor *Talbot* granted an injunction, on filing the bill, and continued it after answer, though it was a patent from the *crown*, and not under the statute.

In *Gurney* v. *Longman*,† the plaintiff was appointed, pursuant to an order of the house of lords, to take an account of the trial of Lord *Melville*, and no other person was to presume to publish it. The plaintiff having taken down the trial, and prepared it for publication, an injunction was granted to prevent the defendant from publishing an account of it, taken in the gallery. Though it was a case of doubt, as to the right, the *lord chancellor* granted an injunction, until the hearing; and he alluded to the same principle as decided by Sir *Joseph Jekyl*, and affirmed by the lord chancellor, in 1718.

In the case of the *Two Universities* in *England*, against *Richardson*,‡ which related to the sale of *bibles*, by the king's printer in *Scotland*, and involved the prerogative rights of the crown, the chancellor lays down the rule that an injunction, though the the legal title be doubtful, will be granted and continued until the hearing, and he expresses his dissent from the *dictum* of Lord *Mansfield*, to the contrary, in the case of *Miller* v. *Taylor*.

*Gyler* v. *Wilcox and others*§ was the case of a *copyright*, under the statute of *Anne*, and the chancellor directed a reference to two persons, and continued the injunction until their award was made. He said that it was not a case of monopoly; and that the statute ought to receive a liberal construction, being intended to secure the property to authors in their books, as some recompense for their labour in works of public utility. The case of *Whitechurch* v. *Hide*,¶ in which an injunction was refused, was considered as being a monopoly, and a very doubtful right claimed under a *franchise*, and not founded on any statute. It has, therefore, no analogy to the present case.

*Bell* v. *Walker and Debrett*** was a case of doubtful right, yet an injunction was granted. *Carnon* v. *Bowles*†† was also a case of *copyright*. So, also, was that of *Jeffery* v. *Bowles*.‡‡ They did not arise on any common law right. So *Blackewall* v. *Har-*

* 3 *P. Wms.* 255.

† 13 *Ves.* 493.

‡ 6 *Ves.* 698—707.

§ 2 *Atk.* 141. S. C. 3 *Atk.* 269.

¶ 2 *Atk.* 319.

** 1 *Bro. Ch. Cas.* 451.

†† 2 *Bro. Ch. Cas.* 81. See also *Faden* v. *Stockdale*, in note.

‡‡ 1 *Dick.* 429.

*IN ERROR.*

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.
\* 2 *Atk.* 98.

† 4 *Burr.*
2303—2399.
*Ib.* 2379.

‡ 4 *Burr.*
2408. 2417.

§ 2 *Atk.* 93.

¶ 2 *Atk.* 342.

\*\* 1 *Atk.* 141.

*per\** arose under the statute of 8 *Geo.* II. as to engravings. The common law right does not apply to works of invention.

An injunction is an appropriate remedy for a violation of all statute rights. They are granted of course. The numerous cases decided before the revolution are conclusive on this point, and binding on this court. The remedy is contemporaneous and concurrent with the grant itself, and cannot be separated from it. The right and the remedy passed to the appellants at the same time. The remedy is a part of the grant and cannot be taken away.

But it will be said, on the part of the respondents, that this remedy is appropriate to common law rights. Though Lord *Mansfield,* in the case of *Miller* v. *Taylor,*† considered the *chancellors* who had granted injunctions, as proceeding on the common law right, yet *Yates,* J. was of a different opinion. He thought, with Lord *Hardwicke,* that the cases of injunctions were founded on the statute; the chancellors not undertaking to determine the general question as to the *common law* right. And the opinion of Justice *Yates* finally prevailed in the *house of lords,*‡ and an injunction was granted accordingly.

The penalty given by the statute is merely cumulative, and is wholly distinct from the right of property given by the act.§ In *Pope* v. *Curl*¶ the injunction was granted on the statute. Why should not a statute right be equally sacred, and entitled to equal protection as a common law right? Is not a right of property granted by the legislature, for meritorious services, equally valid, as if derived by inheritance?

If under a statute conferring a right, and inflicting a penalty, the party can only recover the penalty, as a compensation for the violation of his right, the benefit pretended to be conferred would be empty and delusive. Though the respondents might lose their boats, they would make their fortunes, while the cause was pending from year to year, and removed from one court to another, in a course of tedious litigation. Such a construction would be a temptation to fraud and to the violation of law. The legislature has encouraged the appellants to proceed in their experiment, and to incur very great expense, at the hazard of their ruin; and the state is bound, in honour and good faith, to protect them against those who, without incurring any risk, now seek to deprive the appellants of the profits of a successful enterprise.

This is not a *penal,* but a *remedial* statute.\*\* The penalty is cumulative; it is not given by way of compensation, but *in terrorem;* to *deter* others from a violation of the law. The act giving the

*forfeiture*, was for the " better encouragement of steam-boats ;" it does not take away or diminish the remedy. If the boats of the respondents are forfeited, *ab initio*, and the property in them vested in the appellants,* then a court of chancery will enjoin the respondents from using the property of the appellants to their prejudice. Are the appellants, after a lapse of years, to have nothing but the mere boats for their compensation? This notion has grown out of a decision in a criminal case,† that " when a statute creates a penalty for doing a thing which was no offence before, and appoints how it shall be recovered, it shall be punished by that means, and not by indictment." In *The King* v. *Harris,*‡ the principle is correctly stated by *Ashhurst*, J. that when a new offence is created by act of parliament, and a penalty is annexed to it, by a separate and substantive clause, the prosecutor need not sue for the penalty, but may proceed on the prior clause, on the ground of a misdemeanor. But there was a public offence, and being a criminal case, it is not strictly applicable to the present.

The statutes of 8 *Ann.* c. 19. and 8 *Geo.* II. give forfeitures and pecuniary penalties, yet the remedies have been held to be cumulative. In the case of *Morse* v. *Read*, decided by Chief Justice *Ellsworth*, in the circuit court of the *United States*, held in this state, a perpetual injunction was granted, besides the forfeiture or pecuniary penalty. The act of congress is highly penal, for it gives treble damages; but these are only *in terrorem.* In a case decided in the circuit court of the *United States*, in *Georgia*, on a patent for a machine for cleaning cotton, a perpetual injunction was granted by Judge *Johnson*. In the case of *Usher*, who had a machine for making *soda-water*, which was put into the hands of a mechanic to repair, who, afterwards, refused to return it and used it himself, Judge *Livingston* granted an injunction.

The right and the remedy are for ever inseparable. The right of the appellants was perfect before the act of 1807. The appellants having built the boats, and obtained the requisite certificate, their rights under that act were consummate. The act of 1808 is for the further encouragement of steam-boats, and gives the penalties in a distinct and substantive clause. Before that act, the right of the appellants, for 20 years, was complete and conclusive, as to the remedy, independent of the subsequent act giving a penalty. If the act of 1808 had not passed, could there be a doubt but that the appellants would have been entitled to the

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

* 5 *Term Rep.*
112. 6 *Mod.*
216. 2 *Saund.*
47.
† *Castle's
Case, Cro.
Jac.* 644. 2
*Burr.* 1803.
‡ 4 *Term Rep.*
205.

*IN ERROR.*
······
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.
* 5 *Johns.*
*Rep.* 175.

remedy by an injunction, to protect them in the enjoyment of their right?

In *Almy* v. *Harris,*\* the supreme court decided that the plaintiff having no right at common law, his only remedy was under the statute. But this could not prevent the party from applying to a court of equity, if he had a right under the act to the ferry, for an injunction to prevent others from disturbing him in that right.

The acts of the legislature, separately or together, constitute a *contract* between the people of the state and the appellants; and in the last act, it is mentioned as a contract. The respondents are to be deemed parties to it. The appellants have a right to ask for a specific execution of the contract. The penalty is not to be considered as assessed damages; but is merely given to secure the enjoyment of the object. Where there is a suit on a covenant with a penalty, an injunction will be granted, until a final hearing of the cause.† In the case of *The City of London* v. *Pugh,*‡ the lessee covenanted not to dig up a particular part of the premises, &c. under the penalty of 100*l.* for each acre; on a breach of the covenant the lessor filed a bill for an injunction, which was granted, and after answer, the defendant agreeing to appear and plead to an action at law, the injunction was dissolved; but on appeal to the house of lords, the injunction was ordered to be continued until the final hearing of the cause. These cases clearly show that the penalty is not in the nature of a compensation, but merely an auxiliary remedy.

† 1 *Bro. Ch. Cas.* 418.    5 *Ves.* 555.
‡ 4 *Bro. Parl. Cas.* 395.
*Mitf. Pl.* 122.
*Coop. Eq. Pl.* 156. 148.
*Amb.* 694. 737.

*Wells* and *Henry,* (*Van Vechten,* on the same side,) for the respondents; 1. The acts of the legislature under which the appellants claim, are contrary to the constitution of the *United States,* and, therefore, void. The appellants do not come here as inventors claiming the reward due to genius.. They come with the spoils of genius not their own, and claim to be protected in the possession of what they have thus acquired. On the score of experiment and expense, the respondents have equal claims. The parties stand before this court on equal equity.

We contend that these legislative grants are void:

1. Because, they interfere with the power granted to congress relative to *patents.*

2. Because they interfere with the powers vested in congress to regulate *commerce.*

All the powers of congress are either exclusive or concurrent.

*IN ERROR.*
......
ALBANY,
March, 1812.
~~~
LIVINGSTON
v.
VAN INGEN.

Where the power is, in its nature, exclusive, that exclusiveness need not be expressed; it is otherwise, where the power is concurrent. In all the cases of powers prohibited, the powers were otherwise concurrent. There are other cases where the powers are concurrent in part, and where the states may exercise the power, but only in absence of the exercise of the like power by congress; if congress act in the case, the states cannot.

The power to lay taxes is concurrent. The states may lay taxes as well as congress, for they are essential to the support of government. As to the power to lay duties on imports, &c. there is nothing, in its nature, exclusive; and the individual states are, therefore, expressly prohibited from exercising it. There is no prohibition as to paying public debts, or borrowing money on the faith of the *United States,* because those powers are necessarily and intrinsically exclusive. So the powers to regulate commerce with foreign states, and between the states; to establish a uniform rule of naturalization, and uniform laws of bankruptcy, are, naturally and impliedly, exclusive, for if the different states were to exercise those powers concurrently, it would introduce that infinite confusion and diversity which the constitution intended to prevent.

The decision in *Collett* v. *Collett* was idle and nugatory, if it was meant that the individual states may pass naturalization laws, in conformity to the laws of congress; but if it meant any thing more, it was clearly wrong; and the case was afterwards questioned by *Iredell,* J. in the *United States* v. *Villato.**   * 2 *Dallas's Rep.* 370.

But a *concurrent* legislative power in the several states seems to be absurd. If exercised, it must be either in conformity with that of congress, or in enacting the same thing, and so nugatory, or else, in collision with, or contradictory to, the law of congress, and so void.

The true meaning of this part of the constitution of the *United States* has been stated and explained by a very able commentator,† an illustrious statesman and distinguished lawyer. He considers the power to establish a uniform rule of naturalization as necessarily exclusive, because if each state had power to prescribe a distinct rule, there could be no uniform rule on the subject. The power to coin money and regulate its value, and to fix the standard of weights and measures, to establish post-offices and post-roads, as they relate to the common concerns of society and the public good, may be exercised by the states, until congress   † *Hamilton.* See *Federalist,* No. 32.

*IN ERROR.*
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

shall legislate upon those subjects.  But as soon as congress have passed laws relative to those objects, there is an end to the state laws; they are superseded, and absorbed in the supreme law of the land.  It is not necessary to an exclusive power in congress, that it should be given in express terms; it is sufficient that it is exclusive by necessary implication.  The power of congress to grant copyrights and patents to authors and inventors, is given without any words of exclusion.  And congress have exercised this power, and made it, in fact, exclusive.  The states cannot pass laws on the subject; for if they are the same as those of congress, they are useless and nugatory, and if different, they conflict with the power of congress, and must, therefore, be void.  If one state might pass a conflicting law, so might every other.  If this state stood alone, as an absolute, sovereign, and independent state, no doubt it might grant monopolies and exclusive privileges, like the *British* parliament, which is said to be omnipotent; but as a member of the union, its power is subordinate to that of the *United States.*

Congress have prescribed the manner of acquiring and enjoying the property, and its duration.  There has been a plenary exercise of power on the subject.  There is nothing remaining on which the states can legislate.  If powers can be exercised by the states and by congress, without conflicting, then they are concurrent, otherwise not.  There must be a conflict of authority, if the several states act on the subject.  Different states may pass different acts, disagreeing with those of congress, and with each other.  This was one of the evils under the old confederation, and which the new constitution was intended to prevent.  Every state passed laws on the same subject, and thirteen different rules or sets of regulations prevailed.  The states have, by mutual consent, transferred the power to congress, to whom it necessarily, and of right, belongs.  The 6th section of the act of congress relative to patents, is a legislative commentary on the constitutional power.  It declares that where any state, before the adoption of the constitution, had granted an exclusive right to any invention, the party claiming that right should not be capable of obtaining an exclusive right under that act, unless he relinquished his right under the particular state ; and his obtaining an exclusive right under the act of congress, is declared to be sufficient evidence of his relinquishment of any right under the state.  The constitution could not take away a right vested before its adoption.  The individual might continue

to enjoy it, or exchange it for a more extensive privilege under
the *United States*.

It is said that the states may restrain or prohibit the exercise
of a patent right within their several jurisdictions; and the cases
of noxious drugs and seditious books have been mentioned as
examples. It is not pretended that such things could be vended
under any law.

Every man must use his property in such a manner as not to
injure another. Because a man has no right to ride over his neigh-
bour's field without his consent, it does not follow that his horse is
not his own, and that he may not ride him on the public highway.

A patent for an invention grants a property in the subject, and
a right to use it coextensive with the jurisdiction of the granting
power, otherwise the right is imperfect. A state cannot, in direct
terms, prohibit the exercise of a patent right within its jurisdic-
tion. It can only be restrained or prohibited, indirectly, as dan-
gerous to the public health, policy or morals, under the municipal
laws. It is admitted that the patent rights must be used in con-
formity to those laws; but the total restriction of their use is a
direct contravention of the authority of congress.

It is said that the states may grant turnpike roads, bridges, fer-
ries, &c.; and their right to legislate on these subjects of munici-
pal regulation is not denied. But suppose a state law should pro-
hibit the mail coach of the *United States* from passing a toll-gate
or bridge, would it not be in contravention of the power of con-
gress, and, therefore, void? Could a state prohibit the *United
States* from establishing a custom-house, or sending a tax-gatherer
within its jurisdiction?

It is said that the act of the legislature is a grant, in the nature
of a *contract*, and not a patent. But it wants all the essential fea-
tures of a contract. It is gratuitous, without reciprocity or mutual
obligation; no time is limited for building the boats, nor is there any
mode by which the state could compel a performance. It is a mere
*permission*. If there was a contract with *Fitch*, then it could not
be dissolved without his consent. The word *contract*, foisted into
the late act, will not alter the case. The notion that the respondents
are bound by this supposed contract, as having been entered into
between the people or their representatives, on the one part, and
the appellants on the other, is much too refined to be acted upon,
and would lead to results the most extravagant and unjust. It is a
doctrine too absurd to be sanctioned by a court of justice.

*IN ERROR.*
......
ALBANY,
March, 1812.
〰〰〰
LIVINGSTON
v.
VAN INGEN.

Again, it is said that although congress have the power to grant exclusive rights to authors and inventors; yet this act, not being a reward or grant to an inventor, does not interfere with the power of congress. The appellants claim only as *possessors.* But if the appellants had claimed to be the *inventors*, could this state have granted to them this exclusive privilege ? Shall they, by changing their character to that of a *possessor*, obtain it ? Certainly not; for the whole patent power in congress might, in that way, be defeated. The state by granting such privileges to *possessors*, would exercise a power superior to and far more extensive than that of congress. Is the mere possessor to be preferred to the inventor ? The object of exclusive privilege is to secure to genius the fruits of its exertions, and to the public the benefits flowing from these intellectual labours.

Suppose a new method should be discovered of propelling boats by steam, with tenfold velocity, and with superior convenience to those of the appellants; yet if the appellants are to prevail, so useful a discovery could not be put in practice. If the whole field is thus preoccupied, what incentive is there to men of genius to exercise their powers for the benefit of mankind ? The acts are impolitic, as well as unjust and unconstitutional. Congress only grant to inventors a privilege for 14 years; this legislative grant is for 30 years, and may be extended to 100 years, or for ever. It is an *unjust monopoly.* The appellants claim this monopoly against all the world, and the respondents, though not patentees, have a right to call their claim in question.

2. These acts interfere with the power of congress to regulate commerce, &c. This power involves the subjects of commerce, as well as the mode of carrying it on. It extends over and pervades all the states. The acts give to the appellants the exclusive right to use their steam-boats on all the waters of the state. It is not confined to any particular river or stream. The state might equally have granted an exclusive right to use sail-boats or row-boats, or boats propelled by any other physical power. The acts are penal, and grant a forfeiture of steam-boats used by others to the appellants. Suppose a steam-boat from *Canada* is found on any of the lakes within the territory of this state; or suppose a vessel, propelled by steam, arrives from any foreign port, or from the state of *New-Jersey,* for the purpose of passing through the sound to *Connecticut,* or elsewhere, could it be seized by the appellants, as forfeited by these acts ? Would not this

interfere with foreign commerce, as well as the commerce between *IN ERROR.* the states? Suppose the use of sails should be discontinued, and all vessels be propelled by steam, a thing in the imagination of the appellants not improbable, could no vessel enter this state, without their permission, under the penalty of being forfeited? Would not the power of congress to regulate commerce be defeated? It is enough for the respondents, if the monopoly granted to the appellants may interfere with the power of congress to regulate commerce, and if all vessels should be propelled by steam, that it would wholly defeat that power. The possibility or probability of this consequence, is sufficient to test the principle of this legislative grant; and the general principle may as well be settled now as at any other time.

<div style="text-align:right">

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

</div>

Next as to the *remedy*, by injunction, in this case. The statute which grants the right, has also given the remedy. If the party claims a statute right, he must take the statute remedy; not claiming a right at common law, he is not entitled to a common law remedy. It is said that rights created by statute, are equally sacred and entitled to the same favour as those at common law. But common law, founded on the wisdom and experience of ages, is entitled to greater favour and respect than a statute, passed hastily, and unadvisedly, perhaps, or under the influence of the prejudices and feelings of the times, or of a party. The genius of the common law is opposed to *monopolies*. It breathes a purer spirit of liberty and justice. The remedy given by the statute is the forfeiture of the boats; and whether they are forfeited or not, is a question to be decided by the common law, not in a court of chancery. By an injunction, the appellants seek to acquire all the benefits of the forfeiture, before their right is established. The trial must be at law. If it should be decided that the appellants have no right, the injury which the respondents may have sustained by the injunction will be great and irreparable. The impropriety of the interference of chancery will be manifest. If the appellants prevail at law, they recover not only the boats, but *damages*,* of which the profits or earnings of the boats will be the measure. The statute then gives ample remedy, and there is no need of an injunction. If, after the right of the appellants has been settled at law, the respondents should persevere in violation of that right, it will then be time enough to apply for an injunction to prevent any future infractions. Where a new right is created by a statute which gives a remedy, that is the

<div style="text-align:right">

* 3 *Bl. Com.*
152. *Cro. Jac.*
682.

</div>

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

* 1 Saund. 135
and note (1).
(4). Cro. Jac.
644 2 Burr.
803. 4 Burr.
2323. 2351.
2406. 2407. 2
Salk. 460. 4
Term Rep.
202. 3 Term
Rep. 444. 5
Term Rep.
544. 5 Johns.
Rep. 175.
† 1 Atk. 282
—284. 1 Vern.
120. 129. 275.
308.

only remedy to which the party can resort. It would be other-wise, if there had existed an antecedent right or duty at common law. The statute remedy would then be merely cumulative; but the appellants can have no other remedy than what the statute has given them. The cases* which support this principle are said to be criminal; but the analogy between criminal cases and civil rights founded on penal statutes, is perfect, in this respect. The rule is the same and must apply to both. All the acts, on this point, being *in pari materia*, must be taken as one statute, and it is, therefore, no objection to the application of the rule that the first statute gives no remedy.

It is a general principle, that no party can come into a court of chancery, in aid of his rights, until those rights have been first established at law.† There is no foundation for the distinction suggested, between rights flowing from the royal prerogative, and those derived from parliament. The right, in either case, is equally valid. The exercise of *state* power may be looked upon with as much jealousy as the exercise of *prerogative*. The exclusive right granted to the appellants is a *franchise*, or *monopoly*, and not entitled to any peculiar favour.

‡ Miller v.
Taylor, 4
Burr. 2303.
2324—2328.
2407—2417.
Donaldson v.
Beckett, 2
Bro. C. C.
129.

The opinion of Mr. Justice *Yates*,‡ as to the rights of authors, did not prevail in the house of lords. They reversed the judgment below, on the ground that the common law right was abridged or taken away by the statute; and that the author had no other right or remedy than what is founded on the statute. *Eight* out of the eleven judges, who gave their opinions on the questions stated by the lords, were in favour of the common law right; but five out of six were of opinion that it was abridged or taken away by the statute of 8 *Ann.*(a) *Yates*, J. denied the *property* of authors at *common law* altogether.

§ 4 Burr.
2327. 2 Atk.
141. 5 Ves.
24. 8 Ves. 215.
in note.

But there are several cases since the statute of *Anne*, in which injunctions have been refused.§ The true and reasonable rule, undoubtedly is, that the party should first establish his legal right, before he asks a remedy. An injunction is intended to quiet the

(a) Lord *Mansfield* being a peer, gave no opinion in the house of lords; but it was understood that he adhered to the opinion expressed by him in the court of K. B., that authors had a *legal property* in their productions, independent of the provisions of the statute; so that the 12 judges were, in fact, equally divided on this great question; and, as the opinions are stated by *Burrow*, seven of the judges, besides Lord *Mansfield*, were in favour of the *perpetuity* of the common law right, though *Nares* and *Gould* agreed with *Eyre*, *Perrott*, *Adams* and *De Grey*, that it had been abridged or taken away by the statute.

1

party in the possession of his right. The rule contended for by the appellants inverts the natural order of proceeding. It administers the remedy before the right is ascertained. The plaintiff must prove his debt before he is entitled to execution. That injunctions should not issue before the right of the party is established, is a principle of the *English* law, settled anterior to the *American* revolution. The few instances in which injunctions were granted before the right was ascertained, were in peculiar and extreme cases, in order to prevent irreparable mischief. Such was the case relative to the publication of the letters of *Pope*. In the case of *Thompson and others* v. *Stanhope*, the publication of the private letters of Lord *Chesterfield* might have been an irreparable injury to many living persons. In *Melville's Case*, the property had been stolen, fraudulently and piratically. If the *English* court of chancery has laid down a different rule, since our revolution, this court is not bound to adopt it. It ought to preserve the law as it then stood, in its primitive purity.

In *Gurney* v. *Longman*,* Lord *Eldon* expressed great reluctance to granting an injunction, until the right was established at law; and he granted it, under the peculiar circumstances of that case. In *Field* v. *Jackson*† the chancellor refused an injunction to stay waste, because the right was doubtful. It arose upon the construction of an act of parliament, which was doubtful; and, therefore, he would not grant it.

In *Hogg* v. *Kirby*,‡ Lord *Eldon* sanctions the observations of Lord *Mansfield*, in *Miller* v. *Taylor*. The principle on which injunctions had been granted was, that damages did not give adequate relief. The chancellor either examines the books, or refers them to a master, to report whether there has been a piracy or fraud in the second publication, and an injunction issues if such appears to be the fact.

The principle on which all these cases of injunctions proceeded, is founded on the doctrine in the case of *waste*. For the destruction of trees planted by an ancestor, and consecrated to the affections and feelings of a family, no damages can afford a compensation.

In the present case, full compensation in damages can be obtained. All the profits made by the respondents may be recovered by the appellants. But if it should be found that the respondents have the right, an injunction would work an irreparable mischief to them, for they never could obtain an indemnity from the appellants.

* 13 *Ves.* 493.

† 2 *Dick.* 599.

‡ 8 *Ves.* 215. 224.

*IN ERROR.*
......
ALBANY,
March, 1812.
LIVINGSTON
v.
VAN INGEN.

*T. A. Emmet,* in reply. It has been properly admitted by one of the counsel for the respondents, that if the right of the appellants was valid, the remedy followed of course. The question involved in this cause, though of great importance, is nothing more than a question of *property*. This court is not called upon to examine into the wisdom or expediency of these acts of the legislature, nor as to the policy of monopolies. Such an inquiry would be altogether extrajudicial. Be the laws ever so impolitic or unwise, it is the duty of this court to pronounce upon them as they find them. Much the greater part of the arguments of the learned counsel on the other side, might, therefore, have been spared, as wholly irrelevant; and if all that has been said about the *expediency* of the acts, and the odious nature of *monopolies,* be taken away, the specious body of their argument will be reduced to a mere skeleton, without flesh or muscle. These laws, after being enacted by the different branches of the legislature, have passed five different councils of revision, composed of the collected wisdom of the state, and when the eyes both of the legislature and the council were open to the constitutional objections which have been mentioned. If it were proper to cite such authority here, it might be said, that there had been five adjudications, by five successive sets of judges, on the very question now before the court.

These laws must be considered, *prima facie,* valid, and their invalidity must be clearly shown by the respondents.

Granting, however, to the respondents, the benefit of their propositions, the acts must be deemed valid so far as they do not interfere with patents for *inventions,* or the regulations of commerce. A statute may be good in part and void in part. It is void for the excess merely; and so far only as it must, of necessity, be void.

1. These laws do not infringe the power of congress to grant patents for inventions. Congress can only *secure,* not create a benefit, and this security or exclusive right can be given only to *authors* and *inventors.* Congress can only legislate as to inventions; and this state may legislate on subjects, concerning which congress cannot legislate.

Because the appellants have not called their steam-boat an invention, the respondents have assumed that it was none, and have endeavoured to strip the appellants of all merit or claim to legislative patronage. But the appellants, if they are not inventors, have, at least, the merit of introducing a very valuable im-

provement from *Europe*. Every civilized nation protects im- *IN ERROR.*
.....
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.ported improvements. What would *Great Britain* have been, had she not wisely availed herself of the discoveries and improvements of other countries? By nature, less fertile than the islands of the *Mediterranean*, she has by the aid of foreign genius, by securing an exclusive right to imported improvements, fertilized her soil, extended the arts, enlarged commerce, and amassed wealth and power above all the isles of the ocean, and which have enabled her to contend with the greatest nations of the earth. Can this country expect to take its eagle flight, and to reach its high destinies, by the strength of its own genius alone, without the aid of foreign invention? If the states cannot protect and reward imported improvements, congress certainly cannot. It can only patronise inventions. But this power exists in every sovereignty. It must exist in the states. It is an attribute of sovereignty retained by them, that they might promote the welfare and happiness of the people, by conferring rewards on the authors of useful discoveries, and encouraging foreign genius to become domiciliated in the land.

*Monopoly* is a technical term. It is a *prerogative* grant, in hostility to the public good. Who ever heard of a monopoly erected by act of parliament? This legislative grant was intended to compensate genius for introducing, extending, and perfecting, the invention of others. A public benefit was contemplated; not from the pride of invention, but from the enjoyment of the machine.

Though the appellants do not claim as inventors, yet we contend that even a patent from congress to the respondents would not defeat this legislative grant.

The power to promote science and the useful arts, by granting patents to the inventors, is a concurrent power. Instead of having to contend with the opinion of the able writer of the " *Federalist,*" who has been so warmly and justly eulogised by my learned friends, I hope to secure him on the side of the appellants, and avail myself of his authority to show that some of the powers granted to congress are concurrent. He regards all powers not *exclusively* delegated to the *United States*, as retained by the states. This exclusive alienation of state sovereignty by the states, he considers as existing in three cases: 1. Where the constitution has, in *express* terms, granted an exclusive authority to the union; 2. Where it is granted to the union, and the states are expressly

IN ERROR.
......
ALBANY,
M..rch, 1812.

LIVINGSTON
v.
VAN INGEN.

prohibited from exercising the like authority; and, 3. Where an authority is granted to the *United States*, to which a similar authority in the states would be absolutely and totally contradictory and repugnant. The third class of cases appears wholly unnecessary, and ought to be rejected. He admits that " it is not a mere possibility of inconvenience in the exercise of powers, but an immediate constitutional repugnancy, that can, by implication, alienate and extinguish a pre-existent right of sovereignty." This opinion, on the subject of a concurrence of powers, is explicitly stated at the conclusion of the 32d number. That " the necessity of a concurrent jurisdiction, in certain cases, results from the division of the sovereign power: and the rule that all authorities, of which the states are not explicitly devested in favour of the union, remain with them in full vigour, is not only a theoretical consequence of that division, but is clearly admitted by the whole tenor of the instrument." For " notwithstanding the affirmative grants of general authorities, there has been the most pointed care, in those cases where it was deemed improper that the like authorities should reside in the states, to insert negative clauses prohibiting the exercise of them by the states."

Is this case, then, any thing more than an accidental or occasional interference in the policy of a branch of the administration of the union? Is it a case which necessarily implies an absolute contradiction and repugnancy to the power given to congress?

The power to lay and collect taxes, duties, imposts and excises, is stated by the author of the *Federalist* to be a concurrent power, except as to what is expressly prohibited, in the next section, to the several states. Would it be unconstitutional in the state of *New-York* to pay a portion of the debt of the *United States*, or for congress to receive such a payment?

As to providing for the common defence, can this state erect a fort or bulwark for its defence, without benefiting a neighbouring state, or the *United States?*

A state could not have a power to borrow money on the credit of the *United States;* and that is a power necessarily exclusive.

But is the power to regulate commerce with the *Indian* tribes exclusive? The legislature of this state have passed acts on that subject, regulating commerce with them.

The power to regulate commerce with foreign nations, and among the several states, is restricted by the prohibition to the states to make any treaties, alliance, or confederation, or to enter

into any compact or agreement with another state or foreign power.

The states are expressly prohibited from *coining money*, and, of course, from regulating its value; but have they not a concurrent power to regulate the value of *foreign* coin? But congress have acted on the subject. Is not the standard of weights and measures regulated by a law of this state?

The establishment of post-offices and post-roads is also concurrent. For if congress had neglected to establish them, might not this state have provided for the enjoyment of so great a public convenience by its citizens?

The power to establish a judiciary could not have been before possessed by the states, and is, therefore, necessarily exclusive.

The power to define and punish piracies and felonies committed on the high seas, was not vested, in right of sovereignty, in the states, but had always been exercised by congress.

To declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water, are powers expressly denied to the states.

Though congress have power to raise armies, provide and maintain a navy, and make rules for the regulation of the land and naval forces, may not the executive of this state call out the militia to support the laws, suppress insurrection, or repel invasion? Is the state government palsied, and incapable of self defence, because congress has the supreme legislative power? Has not the state a right to regulate the conduct of the militia or troops of the *United States*, while within its jurisdiction, though it cannot order or direct them as to their service?

The only section in which the term *exclusive* is used, is that which gives to congress the "exercise of exclusive legislation, in all cases," over a district of ten miles square, and over places purchased by consent of the states, for the erection of forts, &c.

It has been inferred from the language used in the *Federalist*, (No. 43.) in speaking of the power to promote the progress of science and useful arts, by "securing for a limited time to authors and inventors the exclusive right to their respective writings and discoveries," that "the states cannot *effectually* make provision for either of the cases," that the author considered the power exclusive. But that is clearly not a reason for taking away the power from the states. They may make the best provision in

IN ERROR.

......

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

*IN ERROR.*
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

their power; and congress may make still more efficacious laws on the subject.

Again, it is said that the state power has been absorbed by the *plenary exercise* of the power of congress. Absorption is always in proportion to the absorbing power. If half is absorbed, the other half remains. But this is not the language of the constitution, which is plain and simple ; and the rights of the states are not to be explained away by metaphors and figures of speech.

To exclude the exercise of power by the states, there must be a complete, entire and exclusive legislation on the subject by congress. If there is an implied exclusion arising from any constitutional incompatibility in the exercise of the powers of the two governments, it must be as old as the constitution itself. It must be a plenary power which has existed, *ab initio,* so that from that .moment the power of the states was extinct.

The result of the argument of the respondents is, that there can be no concurrent power where the exercise of the power by congress would exhaust the subject. To this we agree, with the addition of its being a plenary exercise of power ; for nothing but an entire, *plenary,* and exclusive exercise of the power can exhaust the subject.

The federal constitution was adopted by this state in 1788, yet we find, on the 26th *February,* 1789, a few weeks before the meeting of the first congress under that constitution, the legislature passed a law for " securing to *James Rumsey* the sole right and advantage of making and employing, for a limited time, the several mechanical improvements by him lately invented"* This law was passed after the powers in relation to the subject were absolutely transferred by the constitution, according to the construction given by the respondents' counsel, to congress. Yet that law was passed by men perfectly conversant with the federal constitution. *Rumsey* was a *Virginian,* and he obtained a similar patent from almost every state in the union, which shows that the states understood that they still retained, notwithstanding the'new constitution, a power of legislation on the subject. These laws furnish a cotemporary and authoritative exposition of the constitution, and vindicate the power of the states even as to *mechanical inventions.*

In the year 1789, certain amendments to the constitution were proposed ; and of the articles adopted, the 9th and 10th were, " that the enumeration in the constitution of certain rights, shall

*2Greenleaf's edit of Laws, p. 271.*

not be construed to deny or disparage others retained by the people." That " the powers not delegated to the *United States* by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

*IN ERROR.*

......

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

The convention of this state adopted the constitution with the explanation given by General *Hamilton*, who was a member, that no powers were conferred on congress but such as were explicitly given by the constitution.

The 6th article of the constitution is the master-key to what is meant by concurrent power. It declares that " the constitution, and the laws of the *United States* which shall be made in pursuance thereof, and all treaties which shall be made under the authority of the *United States*, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state notwithstanding." When, then, will the supposed collision or interference between the laws of congress and of the states arise? Whenever congress exhausts the subject by a plenary exercise of its legislative power, then the laws of the states must interfere with the law of congress. In no other respect is congress supreme. Its supremacy is co-extensive with its legislation.

The act of congress *of the 14th of April*, 1802, relative to *naturalisation*,* does exhaust the subject. It declares that any alien, being a free white person, may be admitted to become a citizen of the *United States*, or any of them, on the following conditions, *and not otherwise.*" Until this plenary exercise of the power by congress, the power of the states was concurrent. This act of congress admits that a concurrent power did exist in the states; else, the terms " not otherwise" were useless; but they were inserted to take away the exercise of a concurrent power on the subject. In *Collett* v. *Collett*, decided in 1792, the circuit court of the *United States*, consisting of Justices *Wilson, Blair* and *Peters*, were of opinion, that the states did enjoy concurrent authority on the subject; but that their individual authority could not be exercised, so as to contravene the rule established by the authority of the union. The term *uniform*, as applied in regard to the rule of naturalization, has the same meaning as when used in the first paragraph of the 8th section, in regard to duties, imposts and excises. It relates to the mode or manner of exercising the power by congress; not that the states should not lay any such taxes. It means only that the law

*7 *Cong.* sess. 1. c. 28.

*IN ERROR.* should be *uniform* in all the states; so that a person should not, by two years' residence in *Virginia*, five years' residence in *New-Jersey*, and three years in *New-York*, be entitled to be admitted as citizens. If the argument of the respondents is sound, then the states, after the adoption of the constitution of the *United States*, had no right to naturalize aliens. Yet we find that the legislature of this state, by an act passed the 28th of *February*, 1789,* did naturalize, by name, above 100 persons, many of whom rank among our most respectable citizens. In the case of *The United States* v. *Villato,†* Judge *Iredell*, though he intimated an opinion that the power of naturalization operated exclusively as soon as it was exercised by congress, did not think it necessary to decide that point, and the cause was determined on a different ground.

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

*2*Greenleaf's* edit. of Laws,* p. 279.
† 2 *Dallas's Rep.* 371.

It has been said that the law of congress relative to patents shows that the laws of the states were regarded as incompatible, since it requires persons to surrender up the rights derived from the states, before they can obtain patents from the *United States.* It was not until 1793 that this clause was introduced. It is not to be found in the act of 1790.

All the states had granted exclusive rights before the act of 1793. To repeal or destroy those grants would have been a breach of good faith; an act of turpitude. Congress holds out inducement, by superior privileges, to the patentees under the states to surrender their rights, and thereby exonerate the states from their grants.

Congress gives the exclusive right for 14 years; it might have been for one year only. Is that a plenary exercise of the legislative power on the subject? There is no prohibitory clause, as in the naturalization law of 1802. May not the states, after the expiration of the 14 years, give to the patentee an exclusive privilege within the state, for 14 or 20 years more? To take away the power of the state, congress must have exercised complete and entire legislation, by using words of exclusion. The grant of the state is good so far as the state has power, and is void only for the excess. There must be an actual interference between the two laws, to render that of the state void. It is not to be considered void, because some unborn regulation of congress may, by possibility, hereafter exist, with which it might interfere.

But though not stated in the bill, we assert that this mode of propelling a boat by steam is an *invention*, and even, as such, we contend that the appellants have a right to the enjoyment of it, under

the law of the state. Congress have not power to confer a boon or reward. Its power is merely to *secure* a right for a *limited time.* The merit or demerit of the subject is not examined. The act of congress makes only a general and indiscriminate regulation; it does not reward genius. It makes no distinction between the inventor of a steam engine and one who invents a smoke-jack. The state grants and *creates* an estate, and rewards the inventor. The patent merely *secures* the property to the inventor for a certain time. It proceeds as to authors, on the common law notion; as to inventors, on natural rights. In *England*, the exclusive privilege was enlarged to *Harris & Bolton*, by act of parliament. The patent law only makes the book or machine tangible property, by clothing the productions of the mind with the attributes of personal property. It puts the author or inventor in possession of the production of his mind, which, after being disclosed, would become the property of the public. It puts it on the footing of a *chattel.* It gives no remedy for obstructing the exercise of the right. This shows that it was meant to secure the mere property only; and leave it to the several states to regulate the enjoyment or use of it, in the same manner as every other right of property. A state may prohibit or take away the enjoyment of real or personal property, whenever it deems it necessary to the public good. The patent right is to be enjoyed fully and amply, so far as it does not contravene the laws of the several states. Suppose a patent should be granted under the *United States* to Mr. *Fulton*, for his *torpedoes*, a dreadful instrument of destruction, could not this state prohibit him from planting them in the harbour of *New-York*, to the danger of every vessel that might touch them? What, then, becomes of the doctrine, that patent inventions may force themselves into our fields and habitations, and stride over the land as a blessing or a pestilence, while the states must bow in homage, or reverential horror, to the potent and pestilential patent?

Admit that the states might combine by their laws against the patent invention. Can a state make no law for fear of such a possible combination? But every state may, in defence of the morals of its citizens, prevent the sale of splendid and seducing pictures, though they are patent property. *Georgia* permits the importation of slaves. But may not all the other states enter into a hallowed combination against this immoral and detestable commerce? Each state may regulate the introduction or use of property within

IN ERROR.

ALBANY, March, 1812.

LIVINGSTON v. VAN INGEN.

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

its jurisdiction, whether it be patent property or not. The consti-
tution of the *United States* does not prevent this state from filling
up the mouth of the *Hudson*, so as to prevent the navigation alto-
gether. If such a thing should be done, however we might de-
plore the madness or folly of the measure, it would be an act of
sovereignty to which all must submit. The only control or
check to such an exercise of power must be the good sense of the
legislature, the interests of the people, and the force of public opi-
nion.

If the public good should require it, might not the legislature
prohibit the navigation of the *Hudson* by vessels of a particular
size or construction ?

Suppose a bar in the river, over which vessels only of a certain
tonnage could pass, and a person should invent a mode of remo-
ving the bar, could not the legislature reward the genius of the in-
ventor, by requiring all vessels of a larger size to pay him a certain
toll ? Would not the legislature of *Pennsylvania* grant an exclu-
sive privilege, as to navigating above the first falls of the *Delaware*,
to the genius who should be able to remove that obstruction, and
thereby confer so great and lasting a benefit on the state ? Has
not the *steam-boat* cleared the *Hudson* of the bar of ignorance
and prejudice, and conferred an equal benefit on the public ?
The steam-boats do not hinder or prevent the ancient mode of
navigating the *Hudson*. All vessels and boats with sails are as
free to pass as before. All existing rights are left unimpaired.

How do these acts interfere with the regulation of foreign com-
merce ? The boats do not transport merchandise ; they carry
passengers only. If they did, in part, interfere with the law of
the *United States*, they would still be valid for the residue ; for it
is not denied, that where there is an actual collision with the law
of congress, the state law must yield. But this interference must
be pointed out.

If the power of congress to regulate foreign commerce is ab-
solutely exclusive, so must be the power to regulate the trade
with the *Indians*, and between the different states. The con-
struction contended for by the respondents would break down
our toll-gates and bridges, ruin our canals, destroy our ferries and
every other arrangement for the accommodation of the public, and
the convenience of social intercourse. In how many instances
does our statute book exhibit regulations as to foreign commerce ?
From the 1st of *June* to the 1st of *November*, no foreign vessel

can come up to the custom-house, but must remain at *Staten* IN ERROR.
......
ALBANY, *Island;* and every vessel must pay a sum of money to the health-officer appointed by the state; masters of vessels must report March, 1812. their passengers, and give security to the mayor of *New-York* that they do not become chargeable as paupers. Slaves cannot be LIVINGSTON
v.
VAN INGEN. imported, though in some other states deemed articles of merchandise. Hides and other noxious articles cannot, at certain seasons of the year, be landed; and, in a thousand other instances, the legislature of this state have made regulations affecting foreign commerce. The principle of the respondents would carry havoc through your statute book. The *quarantine* laws and regulations of the state are recognised and enforced by an act of congress.* * *Vol.* 4. p. 259. 5 *Cong.* All these state regulations are valid, subject, however, to yield to sess. 3. c. 118. any express law of congress on the same points.

The constitution of the *United States,* by prohibiting the states from laying a duty on imports, admits the power of the states to regulate commerce. Acts of the state coördinate with those of the *United States* are good. If congress makes a particular port of entry, the state cannot prohibit the entry of vessels there. If congress should declare *Harlaem* to be a port of entry, what is to become of *Cole's Bridge* over that river? Should *Albany* be made a port of entry, cannot the state erect a bridge across the *Hudson* below that city? Every *toll-bridge* leading to other states, over which merchandise is carried, is a regulation affecting commerce. What is the *Cayuga ferry* but a commercial regulation, by which a transit duty is collected on the road to *Canada?* *Barton's Mills* and ferry, at *Niagara,* regulate the commerce with *Canada.* Yet the *United States* have submitted to all these regulations. The counsel for the respondents call these *municipal* regulations; but, under the name of a *municipal* regulation, can the state regulate foreign commerce? In *Perrin* v. *Sikes,*† a grant by the legislature of † *Day's Cases in Error,* 19. *Connecticut* of an exclusive privilege, with a penalty, to run stage waggons on the post road as far as the line of the state was held valid. The mail of the *United States,* and the troops of the *United States* passing toll-gates and bridges, are obliged to pay toll. The right to exact the toll in those cases has never been questioned by the *United States.* The best public works, and the most valuable stock in the states, would be annihilated by the argument of the respondents, under the idea of a possible interference with the power of congress to regulate commerce.

*IN ERROR.*
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.
* Sess. 34. c.
200.

Congress has power to pass *uniform* laws on the subject of bankruptcy; but are the state insolvent laws, which are in substance bankrupt laws, unconstitutional? The word *uniform*, in the constitution, is not an enlarging, but a restrictive word.

Then as to the *remedy* by injunction. The act of the last session* is a legislative interpretation of the law, and expressly recognises the right of the appellants as well as the remedy. Why should the cause be sent to law to try the title, when that title is clear? Cases are sent to be tried at law to clear up a doubtful point. Is not this court competent, with the aid of the five judges, to decide every legal question? Issues at law are directed by chancery, to take the opinion of the law judges as to the validity of a grant, or to try a doubtful fact, by the intervention of a jury. In *prerogative* cases, the chancellor is bound by 21 *James* I. c. 3. s. 3. to send the case to law to be tried. Lord *Coke*† says, that the act having declared all monopolies, &c. void, has provided that they shall be examined, heard, tried and determined at the courts of common law, according to the common law, and not in the council chamber, &c. A court of chancery was expressly excluded, by that statute, from trying the validity of such grants.

Except in prerogative cases, there is no instance of a cause sent to be tried at law, without an antecedent injunction. In the case as to the prolongation of *Bolton's* patent,‡ by act of parliament, it was sent to be tried at law, with an injunction. The law judges of the common pleas differed as to the validity of the patent, and the chancellor continued the injunction until the right could be again tried at law.

In *Gurney* v. *Longman*,§ the chancellor did not send the case to be tried at law, but decided upon it himself, and granted an injunction.

On prerogative questions, to this day, the case must be sent to law; but under the statute of *Anne*, and where the right is founded on the statute, there is not a case to be found where an injunction has been refused. It is surprising that the contrary should have been asserted by the learned counsel. In *Tonson* v. *Collins*,¶ the question was on the broad common law right; the court, though in favour of the plaintiff, gave no opinion, as they suspected the action to be *collusive*, and being ascertained of the fact, refused to proceed in the cause. While the question was thus pending in the court of K. B. doubts arose in the court of chancery, and Lord *Northington*, in *Millar* v. *Donaldson*, and *Osborne* v.

† 2 *Inst.* 182.

‡ 3 *Ves.* 140.

§ 18 *Ves.* 493.

¶ 4 *Burr.*
2327. 2353.
2383. 2400.

*Donaldson,* refused an injunction, without any opinion being given; but the question did not arise under the statute of *Anne.* The case of *Gyles* v. *Wilcox and others** did not arise under the statute of *Anne;* and an injunction was not refused, but the reasons of the chancellor were in favour of it. The same case was again before the chancellor,† and he ordered the injunction to be continued.

The cases of *Carey* v. *Faden,‡ Hogg* v. *Kirby,§* and *King* v. *Reed,¶* were not within the statute of *Anne.* The rule stated by Lord *Mansfield,* in *Miller* v. *Taylor,*** that a court of chancery will not grant injunctions, unless the legal property is made clear at law, has been very much qualified;†† and an injunction always precedes a reference or trial at law, to ascertain doubtful facts. As there is no *prerogative* right in this state, the rule must be to issue an injunction in the first instance. This court can pronounce on the validity of the law. Where is the room for doubt? If this court doubts now, when will it ever cease to doubt? Settle the law now, and then the injunction follows the title, unless the answer sets up disputed facts for a jury, and then the injunction must continue until a hearing. The acts are *prima facie* valid; and if there are doubts, an injunction ought to continue until those doubts are removed. Why should not a statute right receive the same protection as a common law right? In *England,* injunctions issue to protect statute rights.‡‡

The rights of Mr. *Livingston* were valid before the statute was passed which gave the forfeiture. The penalty was a cumulative remedy. It did not take away or destroy the right and remedy which antecedently existed.

The rule that where a remedy is given by statute, it is exclusive of every other remedy, is applicable only to criminal cases. The rule was never applied to a *civil* case, before that of *Miller* v. *Taylor,* nor has it ever been so applied since. Baron *Eyre,* before the house of lords,§§ says expressly, that though an author is precluded by the statute from every remedy, except on the statute; yet there may be a remedy in equity upon the foundation of the statute, independent of the terms and conditions prescribed by the statute, in respect of the penalties thereby given. The rule is confined to *criminal cases,* and in them it applies only where the remedy is given in the same section which creates the offence.¶¶ The case of *Almy* v. *Harris**** was a *qui*

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.
* 2 *Atk.* 141.
† 3 *Atk.* 269.
‡ 5 *Ves.* 24.
§ 8 *Ves.* 215.
¶ 8 *Ves.* 223.
in note.
** 4 *Burr.* 2400.
†† *Coop. Eq. Pl.* 155, 156.

‡‡ 2 *Atk.* 98.

§§ 4 *Burr.* 2409.

¶¶ *King* v. *Harris,* 4 *Term Rep.* 202. 205.
*** 5 *Johns. Rep.* 544.

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

*tam* action, under the peculiar words of the statute which gave the right to no one; and it was, essentially, a *criminal* case.

Again, here was an executory contract, and the condition having been performed by the appellants, it would be an act of perfidy in the state not to perform the contract on their part. Such a breach of good faith would level genius, public honour and integrity in the dust.

YATES, J. This is an appeal from an order of the court of chancery, refusing to grant an injunction.

The appellants claim an exclusive right to navigate the waters of this state, by steam, for a limited time, grounded upon several statutes of this state, by which this right is granted, and intended to be protected and secured to them.

The respondents contend that the laws are void, as repugnant to the constitution and laws of the *United States*, and, therefore, give no right to the appellants upon which the relief, or injunction sought by their bill, could be founded. Two questions, consequently, arise.

1. As to the constitutionality of the laws:

2. Admitting their validity, whether the appellants are entitled to enjoin the respondents, according to the prayer of their bill, or to any other remedy than that prescribed by the legislature.

The importance of this decision must be evident to every one that hears me; no question has, perhaps, ever presented itself to this court of greater magnitude, involving principles so highly interesting to the community. In making up my opinion, therefore, I have endeavoured to bestow the strictest attention, in order to bring my mind to a satisfactory and correct conclusion on the subject.

The first law, passed in *March*, 1798, recited, that whereas it had been suggested to the people of this state, represented in senate and assembly, that *Robert R. Livingston was the possessor of a mode of applying the steam engine, to propel a boat on new and advantageous principles*, but that he was deterred from carrying the same into effect, by the existence of a law granting and securing to *John Fitch* the sole right of making and employing the steam-boat by him invented; that *Fitch* was either dead, or had withdrawn himself from the state, without having made any attempt, in the space of more than ten years, to execute the plan for which he obtained the exclusive privilege, whereby the same was justly forfeited. By this act privileges similar to those be-

fore granted to *Fitch* were granted to Mr. *Livingston,* for twenty years, on his satisfying the governor, lieutenant-governor and the surveyor-general of this state, of his having built a boat, of at least twenty tons' capacity, which should be propelled by steam, and the mean of whose progress through the water, with and against the ordinary current of *Hudson* river, taken together, should not be less than four miles an hour; and that he should, at no time, omit, for the space of one year, to have a boat of such construction plying between the cities of *New-York* and *Albany*. The same privilege was granted, in *April*, 1803, to Messrs. *Livingston* and *Fulton*, the present appellants. In 1807, the act was extended for two years, within which time it was not contended but that the provisions in the first act were complied with, the boat being built, and the experiment proving successful. In *April*, 1808, an act passed for the further encouragement of steam-boats in the waters of this state, and for other purposes. This law enacted, that when-ever *Robert R. Livingston* and *Robert Fulton*, and such persons as they might associate with them, should establish one or more steam-boats, or vessels other than that already established, they should, for each and every such additional boat, be entitled to five years prolongation of their grant or contract with this state; provided, nevertheless, that the whole term of their exclusive privileges should not exceed thirty years after the passing of that act; that no person or persons, without the license of the persons entitled to the exclusive right to navigate the waters of this state by boats moved by steam or fire, or those holding the major part of the interest of such privilege, should set in motion, or navigate upon the waters of this state, or within the jurisdiction thereof, any boat or vessel moved by steam or fire; and the person or persons, so navigating with boats or vessels moved by steam or fire, in contravention of the exclusive right of the appellants, and their associates and legal representatives, should forfeit *such boat or boats and vessels, together with the engines, tackle and apparel thereof, to the appellants and their associates.*

After the most minute examination of those statutes, I cannot find that Mr. *Livingston*, originally, nor Mr. *Fulton*, subsequently, pretended to be the inventors of their steam-boats; on the contrary, by the recital in the law of 1798, *Livingston* represents himself to be the possessor of a mode of applying the steam engine to propel a boat on new and advantageous principles.

This power of granting exclusive privileges, must necesssarily

IN ERROR.
......
ALBANY,
March, 1812.
LIVINGSTON
v.
VAN INGEN.

IN ERROR.
. . . . .
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

exist somewhere, as the legitimate source from whence the encouragement and extension of useful improvements is derived; and from its nature, it is generally exercised by the sovereign authority of every civilized country; and in no government can it be placed in safer hands to ensure those important advantages than in our own, where the sovereignty is in the representatives of the people. Before the adoption of the constitution of the *United States*, every state in the union, unquestionably, possessed the uncontrolled exercise of this power within its own territory, and most of them exercised it, as will appear on an examination of the laws passed by the legislatures of some of the states, several of which have been stated to this court. This, however, is so plain and evident a proposition, that a recurrence to those laws cannot be necessary to establish it.

The laws granting and securing this exclusive right, it is contended, are unconstitutional:

1. Because they interfere with the powers of congress to regulate patents.

2. Because they interfere with the regulation of commerce.

I do not think it necessary, on this occasion, to enter generally into the discussion of the powers granted to congress, and which are to be considered as exclusive, or which ought to be deemed concurrent. It cannot now be questioned, particularly since the amendments to the constitution of the *United States* were adopted, that according to the 10th article of those amendments, "the powers not delegated to the *United States* by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." By the 8th section of the constitution, among the powers granted to congress, it is stated, that they shall have power "to promote the progress of science and useful arts, by securing, for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries." Thus it appears, in the exercise of this power, they are limited to authors and inventors only; this clause, therefore, never can admit of so extensive a construction, as to prohibit the respective states from exercising the power of securing to persons introducing useful inventions (without being the authors or inventors) the exclusive benefit of such inventions, for a limited time; a power no less instrumental in promoting the progress of science and the useful arts, and, consequently, equally essential to the prosperity of the country. The beneficial effects experienced by other countries,

1

IN ERROR.
......
ALBANY,
March, 1812.
⌣⌣⌣
LIVINGSTON
v.
VAN INGEN.

particularly *England*, sufficiently show the policy and propriety of passing laws for the encouragement of imported inventions. This power, then, evidently necessary and useful, is not granted to congress by the clause as to authors and inventors, and as it is not taken away by any other part of the constitution, it must, of course, be retained by the respective states, to be exercised by them, until it interferes with the laws of the *United States*, passed to secure the author or inventor. It is not probable that such collision will take place. Whenever it does occur, it remains exclusively with the courts of the *United States* to interpose; and no doubt can be entertained, but that the person claiming a right by patent, as inventor, would prevail, and the state law would give way to the superior power of congress.

The laws granting this exclusive privilege to the appellants cannot interfere with the regulation of commerce. It never could have been intended that the navigable waters within the territory of the respective states, should not be subject to their municipal regulations. Such a construction might, with equal propriety, be applied to turnpike roads, ferries, bridges and various other local objects, and thus, in the vortex of this construction, almost all subjects of legislation would be swallowed up, and it might, eventually, lead to the total prostration of internal improvements.

To all municipal regulations, therefore, in relation to the navigable waters of the state, according to the true construction of the constitution, to which the citizens of this state are subject, the citizens of other states, when within the state territory, are equally subjected; and until a discrimination is made, no constitutional barrier does exist. The constitution of the *United States* intends that the same immunities and privileges shall be extended to all the citizens equally, for the wise purpose of preventing local jealousies which discriminations (always deemed odious) might otherwise produce. As this constitution, then, according to my view, does not prevent the operation of those laws granting this exclusive privilege to the appellants, they are entitled to the full benefit of them.

By the law of 1808, the boats, together with the engine, tackle and apparel thereof, are forfeited to the appellants ; and a question is raised here, whether they are entitled to any other remedy than that prescribed by the legislature.

This right being claimed under an express grant by the statute, creating the forfeiture, and no doubt remaining of the existence of

*IN ERROR.*
·······
ALBANY,
March, 1812.
⏜⏜⏜
LIVINGSTON
v.
VAN INGEN.

the boats, the presumption was irresistible that they navigated contrary to the statute, and that the property was in the appellants. The injunction, therefore, on those grounds, might well have been ordered. I cannot discover what injury could arise, by preventing such acts as might create the forfeiture afterwards; it could only operate as a prohibition to navigating contrary to the statute.

Most of the cases cited by the respondents, where injunctions had been refused, in the first instance, are cases of *prerogative,* or where the right was doubtful, and the granting of the injunction might create irreparable mischief. I do not think they can apply to this case.

In the case of *Gyles* v. *Wilcox and others,* (2 *Atk.* 141.) a bill was brought for an injunction to stay the printing of a book, and the question was, whether it had been borrowed from another book, contrary to the statute of *Anne,* also creating a forfeiture. Lord *Hardwicke* said it was not a case proper for law, as it would be absurd for a judge to sit and hear both books read over, which was necessary, where one is only a copy; and that the court was not under an indispensable obligation to send all facts to a jury, and continued the injunction, until arbitrators had awarded as to the fact. If this be so, might not the propriety of refusing this injunction to try a fact at law of such public notoriety, as to their navigating or not, be questioned? There is scarcely a citizen not conusant of the fact. And ought this injury, then, to be permitted, in the present case, by an inflexible adherence to what was not deemed indispensable in the case just cited? I should think not.

In the case of *Blackwell* v. *Harper,* (2 *Atk.* 92.) the remedy was by injunction; and where the right is matter of record, injunctions are granted. (1 *Ves.* 476.) So in 3 *Ves.* 140. an injunction was granted, that the validity of a patent might be tried at law; and in *Harmer* v. *Plane,* (14 *Ves.* 130.) an injunction was granted where the right was doubtful, the party being in possession. The cases in 6 *Ves.* 707. and in 1 *Bro.* 451. are to the same point.

From these and numerous other cases, no doubt can exist that the injunction, in this instance, ought to have issued. My opinion, therefore, is, that the order of his honour the chancellor ought to be reversed, and that the cause should be sent back with directions to enjoin the respondents.

Van Ness, J. was of the same opinion, and gave his reasons.

Spencer, J. being related to some of the parties concerned, declined giving any opinion.

IN ERROR.
......

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

Thompson, J. In examining the questions which have been presented in this case, I shall pursue the order adopted on the argument; by first inquiring into the right claimed by the appellants; and, secondly, whether, if the right be established in them, they are entitled to an injunction to restrain the respondents from an infringement of that right.

In considering the first branch of this subject, I deem it unnecessary to go into a particular inquiry as to the constitutional power and authority of the legislature to grant exclusive privileges upon the *navigable waters* within this state. All objections heretofore raised against the laws in question on this ground, have been, in a great measure, abandoned by the respondents' counsel. I would observe, however, generally, that viewing this state as an independent sovereignty, not having surrendered any of its constitutional powers to the government of the *United States*, I am at a loss to discover any reasons why this power should be denied to the legislature. There is certainly no express prohibition in our constitution; nor do I see any reasons, growing out of the nature and principles of our government, for denying to it this act of sovereignty. It appears to me a necessary and indispensable power, which, under a wise and discreet exercise of it, will be productive of very beneficial effects. The power of granting exclusive privileges upon land, has not been, in the least degree, questioned; and the same reasons, both of principle and policy, will allow to the government the exercise of analogous powers upon the waters within the jurisdiction of the state. No distinction appears to have been recognised in the practice of our government. Grants of land under the water, the exclusive right of ferriage, and the regulation of the fisheries in the *Hudson* river, as well as canals, turnpike roads, and exclusive privileges of running stage-waggons, have all been occasionally subjects of legislative bounty and provision.

All the arguments which have been urged against the policy or expediency of granting exclusive privileges in general, or the particular privilege which forms the present subject of inquiry,

*IN ERROR.*
......
ALBANY,
March, 1812.
LIVINGSTON
v.
VAN INGEN.

have been addressed to the wrong forum. They are arguments for legislative, not for judicial consideration. We are called upon to pronounce what the law is, not what it ought to be. In a legislative capacity, considerations of policy and expediency are entitled to their due weight, to convince the judgment or guide the discretion. But in a judicial capacity, no such latitudinary power is given; we are under the solemnity of an oath to decide the rights and claims of parties, according to existing law. Unless, therefore, we are prepared to pronounce the appellants' claim, as set up, to be absolutely void, their right must be considered fixed and established.

I shall not stop to examine whether it be competent for the courts of justice in this state, to disregard acts of the legislature, and declare them unconstitutional and void. The counsel for the appellants have not put their cause upon that ground. But admitting such a power in the judiciary, it ought to be exercised with great caution and circumspection, and in extreme cases only. It certainly affords a strong and powerful argument in favour of the constitutionality of a law, that it has passed not only that branch of the legislature which constitutes the greater portion of our court of *dernier resort,* but also the council of revision, which is composed of the governor and the two highest judicial tribunals of the state, (next to this court,) and whose peculiar province it is to examine and make all constitutional objections to bills, before they become laws. If this affords ground of argument in favour of a single law, which might have passed hastily and without due consideration, how strong and cogent is it in favour of a series of laws, on the same subject, from time to time, enlarging and strengthening the same right or claim; and more especially, as one of those laws has been passed since the present controversy has arisen, and after the attention of the several branches of the legislature must have been called to the objections now raised against them. With such a weight of *prima facie* evidence in favour of the constitutionality of these laws, I should not have boldness enough to pronounce them void, without the most clear, satisfactory and unanswerable reasons. I shall proceed, however, to examine the force of the objections which have been raised against the constitutionality of the laws, giving to the appellants the exclusive right to navigate the waters of the state by steam, uninfluenced by any presumption in favour of their validity.

These objections grow out of that part of the constitution of

the *United States* which gives to congress, 1st. The power to promote the progress of science and useful arts, by securing, for limited times, to authors and *inventors*, the exclusive right to their respective writings and discoveries; and, 2dly. The power to regulate commerce with foreign nations, and among the several states, and with the *Indian* tribes. (Art. 1. s. 8.) It is an undeniable rule of construction, applicable to the constitution of the *United States*, that all powers and rights of sovereignty, possessed and enjoyed by the several states, as independent governments, before the adoption of the constitution, and which are not either expressly, or by necessary implication, delegated to the general government, are retained by the states. This has been the uniform understanding of the ablest jurists, ever since the formation of that government; and it is a rule indispensably necessary, in order to preserve harmony in the administration of the different governments, and prevent that collision which a partial consolidation is peculiarly calculated to produce. This was the object contemplated and intended to be secured by the 10th article of the amendments of the constitution, which declares, that the powers not delegated to the *United States* by the constitution, nor prohibited by it, to the states, are reserved to the states respectively, or to the people. If, then, the grant of the right or privilege claimed by the appellants, would, before the adoption of the constitution, have been a legitimate exercise of state sovereignty, it would, I think, under the rule of construction which I have suggested, be a strained interpretation of that instrument, to say such sovereignty has been thereby surrendered by the state. This power is certainly not denied to the states, nor exclusively granted to the union, by *express terms:* and those powers which are exclusive, by necessary implication, must be such as are created by the constitution, and which did not antecedently form a part of state sovereignty, or the objects of which, from their nature, are beyond the reach and control of the state governments. An express prohibition to the states, against the exercise of powers of that description, would have been useless and absurd. I might go through the various powers given to congress, and illustrate the truth of the position I have laid down, but shall refer only to one or two. Congress have power to *borrow money on the credit of the United States.* This is an exclusive power by necessary implication. It is a power created by the constitution. No prohibition to the states was necessary, and indeed would have been absurd; be-

IN ERROR.

......

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

*IN ERROR.*
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

cause this never was, before the adoption of the constitution, within the scope of state power: no state being able to pledge the credit of the *United States* for the repayment of the money borrowed. The power to constitute tribunals, inferior to the supreme court, falls under the same class.

But it is obvious that the mere grant of a power to congress does not necessarily vest it exclusively in that body. Congress has power to lay and collect taxes. But this does not preclude the states from the exercise of a like power, except so far as they are expressly restrained, in relation to duties on imports and exports. Thus we see that there are subjects upon which the *United States* and the individual states must, of necessity, have *concurrent* jurisdiction; and all the fears and apprehensions of collision in the exercise of these powers, which have been urged in argument, are unfounded. The constitution has guarded against such an event, by providing that the laws of the *United States* shall be the supreme law of the land, any thing in the constitution of any state to the contrary notwithstanding. In case of collision, therefore, the state laws must yield to the superior authority of the *United States.*

The power given to congress to promote the progress of science and useful arts is restricted to the rights of *authors* and *inventors*, and their rights are only to be secured for a limited time. Whatever power the states had over these subjects prior to the adoption of the constitution, and which have not been granted to the general government, and which are not within the scope and purview of its authority, must, beyond all possible doubt, be retained by the states. The appellants do not, in the case before us, claim as *inventors*, but only as *possessors* of a mode of applying the steam-engine to propel boats on new and advantageous principles. The right, therefore, claimed by them, as granted by the laws of this state, was beyond the reach of congressional authority; and the idea ought not for a moment to be indulged that, even admitting this to be a foreign and imported improvement, it is not worthy of legislative patronage and protection. The power given to congress on this subject was intended for the benefit of authors and inventors, and to secure their rights throughout the *United States.* The state government could only give this security within its own jurisdiction. It was, therefore, a wise and useful provision in the constitution, calculated to encourage the arts and sciences, which ought to be a favourite ob-

ject with every enlightened government. But because the states
have delegated to congress this power, in a limited degree, shall it
be denied to them to lend their aid in protecting and patronising
useful improvements in any way they may think proper, not re-
pugnant to the right secured under the authority of congress?
Such a doctrine appears to me degrading to state sovereignty,
and unnecessarily relinquishing a power not contemplated by
the constitution. For the purpose of the present suit, the ap-
pellants are to be considered as the *possessors* only of the in-
vention, and in that point of view I cannot discover the remo-
test doubt as to the constitutionality of the laws, the subject mat-
ter of them not being within the purview of any power given to
congress.

But if the appellants are considered the *inventors*, and en-
titled to a patent, or as having actually obtained one, it cannot
operate as an exclusion of all legislative authority and interference,
to aid and protect the rights thus obtained under the general go-
vernment. If the subject matter be within the scope of state
jurisdiction, and the power is exercised in harmony with, and in
subordination to, the superior power of congress, it is, beyond all
doubt, legitimately exercised. If any person should appear claim-
ing under a patent, in hostility to the privilege granted by this state,
that would be a paramount right, and must prevail, if set up in a
court having jurisdiction of the question; though it may well be
doubted, whether even a patent could be set up, in the courts of
this state, against these laws, as that might involve questions ari-
sing under the laws of the *United States,* which belong exclusively
to the courts of the *United States.* (*7 Johns. Rep.* 144.) It
was admitted by the respondents' counsel, that, had not congress
begun to exercise the power given by this clause in the constitu-
tion, the subject matter would have been within the scope of state
jurisdiction. Why this should make any difference, I am unable
to conceive, as long as the power exercised by the state is not re-
pugnant to, or incompatible with, that exercised by congress. That
the mere grant of a power to congress does not necessarily imply
an exclusion of state jurisdiction, has been the practical construc-
tion of the constitution in a variety of cases. As, for instance,
congress have the power to provide for the punishment of coun-
terfeiting the current coin of the *United States;* yet the legisla-
ture of this state has provided for the punishment of the same
offence; and numerous other instances might be mentioned, if ne-
cessary. The only restriction upon the state government, in the

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

*IN ERROR.* exercise of all concurrent powers is, that the state must act in
subordination to the general government. It is not a sufficient
reason for denying to the states the exercise of a power, that it
*may* possibly interfere with the acts of the general government. It
will be time enough to surrender the power when such interference
shall arise. The framers of the constitution foresaw the possi-
bility of such a state of things, and wisely provided the remedy,
by making the laws of the *United States* the supreme law of the
land. Thus guarded, there can no possible inconvenience result
from the two governments exercising legislative authority over the
same subject. But for the purpose of deciding the present ques-
tion, it is unnecessary to go thus far, because the laws in question
extend protection to the appellants as *possessors* only of the im-
provement, and this not being a subject within the authority of
congress, there cannot arise any interference or collision of power.

The objection to the laws under consideration, on the ground
that they interfere with the power given to congress, " to regulate
commerce with foreign nations, and among the several states, and
with the *Indian* tribes," is less colourable than the former; for
admitting the power here granted to belong exclusively to the ge-
neral government, it does not, in any manner whatever, interfere
with these laws, or extend to the rights and privileges which they
are intended to secure. They neither concern foreign commerce,
nor commerce among the several states, nor with the *Indian*
tribes, but only give to the appellants the exclusive privilege of
navigating all waters, *within* the jurisdiction of this state, by every
species of boat or water-craft, which might be impelled by force
of fire or steam. If this can, in any sense, be considered a regu-
lation of commerce, it is the internal commerce of the state, over
which congress has no power; and if the right to regulate internal
commerce, or the intercourse between different parts of the state,
ever belonged to the state government, it is still retained; for it
never has been, either expressly or impliedly, yielded to the gene-
ral government. To deny to the legislature this right, would be
at once striking from our statute book grants, almost innumerable,
of a similar nature; all our turnpike roads, toll-bridges, canals,
ferries, and the like, more or less concern commerce, or the inter-
course between different parts of the state, and must depend on
the same principles with the privileges granted to the appellants.
The truth, however, is, that none of them relate to commerce
within the sense and meaning of the term as used in the constitu-

IN ERROR.

......

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

tion; they are mere municipal regulations, with which congress have no concern. It can answer no valuable end, to enter into any speculative inquiry as to what would be the effect upon the appellants' rights under these laws, should congress, in regulating commerce, interfere with them. No such interference has at yet arisen, and it will be time enough to consider that question when it does arise. The general and conclusive answer, however, to all such supposed collisions of powers, is what has already been mentioned, that the laws of congress are paramount, and must prevail.

I have thus noticed the principal arguments which have been urged against the constitutionality of the laws under which the appellants set up their claim, and I am satisfied that the objections are untenable; and unless these laws are absolutely void, the right of the appellants is clearly established.

The only remaining inquiry is, whether they are entitled to an injunction, to restrain the respondents from an infringement of that right; and this, it appears to me, must follow as a matter of course. It has been contended that an injunction ought not to issue until the appellants' right has been first settled at law. This is, by no means, the universal, or even the common rule of practice on the subject. Where the right is doubtful, and that doubt can only be removed by a trial at law, there is some plausibility in requiring a party to establish his right before an injunction is granted. But this is not always the course, even in doubtful cases. There are many instances in the books, where the courts have said that possession, under colour of title, is enough to enjoin and continue the injunction, until it is proved, at law, that it is only colour, and not real title. The case of *Boulton* v. *Bull* (3 *Ves.* jun. 140.) is one of that description. An injunction had been granted that the question as to the validity of a patent, might be tried in an action at law; and so doubtful was the right of the patentee, that the court, upon a case stated, were equally divided. Yet the lord chancellor refused to dissolve the injunction, declaring that he would not put the party to accept a *compensation.* So, also, in the case of *The Universities of Oxford and Cambridge* v. *Richardson*, (6 *Ves.* jun. 707.) Lord *Eldon*, in noticing what fell from Lord *Mansfield*, in *Miller* v. *Taylor*, "that it was a universal rule, that if the title is not clear at law, the court will not sustain an injunction," said, that he could not accede to that proposition, so unqualified, for that there had been many instances, within his own

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

memory, in which an injunction had been granted, and continued under such circumstances, until the hearing. The same doctrine is laid down in the case of *Harmer* v. *Plane*. (14 *Ves.* jun. 132.) And the lord chancellor said, there would be less inconvenience in granting the injunction, until the legal question could be tried, than in dissolving it at the hazard that the grant of the crown may, in the result, prove to have been valid. That the question was not really between the parties upon the record; for unless the injunction is granted, any person might violate the patent, and the consequence would be, that the patentee must be ruined by litigation. This last observation is entitled to great weight and consideration, and furnishes a strong and cogent reason for granting injunctions in cases of this kind. The prevention of a multiplicity of suits is one of the most salutary powers of a court of equity. These cases are sufficient to show that it is the prevailing practice in *England,* even where the right is doubtful, and the case is sent to be tried at law, to send it *with* an injunction, instead of denying it on that ground. But where the right is *clear,* an injunction is never refused; as when the right claimed appears on record, or is founded on an act of parliament, it is matter of course to grant an injunction, without first obliging the party to establish his case at law. (*Cooper's Eq. Pl.* 157. *Mitford,* 129. 1 *Ves.* 476.)

In the case of *Blanchard* v. *Hill,* (2 *Atk.* 485.) Lord *Hardwicke* said, that in cases of monopolies, the rule that the court had governed itself by was, whether there was any *act of parliament* under which the restriction was founded. But the court will never establish a right of this kind, claimed under a *charter only from the crown,* unless there has been an action to try the right at law. This will be found, on examination, to be a governing distinction, running through the numerous cases cited on the argument. And whenever an injunction has been refused, the right was claimed under a patent from the crown, and that right considered doubtful.

Applying these principles to the case before us, there is no possible ground upon which the injunction can be denied. The claim of the appellants is founded on acts of the legislature, and if those acts are considered valid, no doubt can exist as to the right. And if any doubt should be thought to exist on that point, yet, according to the established rule in *England,* this is not sufficient to warrant a denial of the injunction. If it be necessary to send the cause to be tried at law, it ought to be sent *with* an injunction,

But where can be the necessity or propriety of sending the appellants into a court of law to establish their right? There are no facts in dispute upon which it is requisite for a jury to decide. The right must depend upon the validity of the statutes under which it is claimed. And that question, according to the course of our courts, may be brought back again to this tribunal for ultimate decision. But it is said the right claimed by the appellants, being created by statute, they are entitled to no other remedy than that which the statute gives.

Without examining whether the rule of law upon which this objection is founded is not confined to criminal cases altogether, it certainly cannot be applied to the present case; for the forfeiture is not given by the same statute which created and gave the right, nor until the right was actually vested in the appellants, by a fulfilment of the terms and conditions upon which they were to be entitled to the exclusive privilege now claimed by them; and if the right was vested, all existing remedies to enforce it were also vested, and are not to be taken away by implication. The act of *April,* 1808, creating the forfeiture, purports to be an act for the *further* encouragement of the appellants' steam-boats, which plainly shows that the remedies therein provided were intended as *cumulative,* and in addition to those already existing. This would be the construction in criminal cases, even where the offence is created and the penalty given by the same statute, provided they are in separate clauses. In the case of *The King* v. *Harris,* (4 *Term Rep.* 205.) *Ashhurst,* J. says, it is a clear and established principle, that where a new offence is created by an act of parliament, and a penalty is annexed to it by a separate and substantive clause, it is not necessary for the prosecutor to sue for the penalty, but he may proceed on the prior clause on the ground of its being a misdemeanor.

I think it unnecessary to pursue the question as to the remedy any farther, or to notice all the cases cited on the argument. I have looked into most of them, and am fully satisfied that if the appellants have the right claimed, the remedy cannot be denied to them. I the more readily abstain from taking up any more time in this examination, because I understood the respondents' counsel as, in a great measure, abandoning all opposition to an injunction, if the right was determined against them. Upon the whole, from a very attentive examination of the case, I entertain

*IN ERROR.*

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

*IN ERROR.*
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

a clear and decided opinion in favour of the validity of the appellants' right, as granted by the acts of the legislature, and that they are entitled to the remedy asked for to protect and secure them in the enjoyment of it.

I am accordingly of opinion, that the decree of the court of chancery ought to be reversed.

KENT, Ch. J. The great point in this cause is, whether the several acts of the legislature which have been passed in favour of the appellants, are to be regarded as constitutional and binding.

This house, sitting in its judicial capacity as a court, has nothing to do with the policy or expediency of these laws. The only question here is, whether the legislature had authority to pass them. If we can satisfy ourselves upon this point, or, rather, unless we are fully persuaded that they are void, we are bound to obey them, and give them the requisite effect.

In the first place, the presumption must be admitted to be extremely strong in favour of their validity. There is no very obvious constitutional objection, or it would not so repeatedly have escaped the notice of the several branches of the government, when these acts were under consideration. There are, in the whole, five different statutes, passed in the years 1798, 1803, 1807, 1808 and 1811, all relating to one subject, and all granting or confirming to the appellants, or one of them, the exclusive privilege of using steam-boats upon the navigable waters of this state. The last act was passed after the right of the appellants was drawn into question, and made known to the legislature, and that act was, therefore, equivalent to a declaratory opinion of high authority, that the former laws were valid and constitutional. The act in the year 1798 was peculiarly calculated to awaken attention, as it was the first act that was passed upon the subject, after the adoption of the federal constitution, and it would naturally lead to a consideration of the power of the state to make such a grant. That act was, therefore, a legislative exposition given to the powers of the state governments, and there were circumstances existing at the time, which gave that exposition singular weight and importance. It was a new and original grant to one of the appellants, encouraging him, by the pledge of an exclusive privilege for twenty years, to engage, according to the language of the preamble to the statute, in the "uncertainty and hazard of a very expensive experiment." The legislature must

*IN ERROR.*
......
**ALBANY,**
March, 1812.
LIVINGSTON
v.
VAN INGEN.

have been clearly satisfied of their competency to make this pledge, or they acted with deception and injustice towards the individual on whose account it was made. There were members in that legislature, as well as in all the other departments of the government, who had been deeply concerned in the study of the constitution of the *United States*, and who were masters of all the critical discussions which had attended the interesting progress of its adoption. Several of them had been members of the state convention, and this was particularly the case with the exalted character, who at that time was chief magistrate of this state,* and who was distinguished, as well in the *council of revision*, as elsewhere, for the scrupulous care and profound attention with which he examined every question of a constitutional nature.

* Mr. *Jay.*

After such a series of statutes, for the last fourteen years, and passed under such circumstances, it ought not to be any light or trivial difficulty that should induce us to set them aside. Unless the court should be able to vindicate itself by the soundest and most demonstrable argument, a decree prostrating all these laws would weaken, as I should apprehend, the authority and sanction of law in general, and impair, in some degree, the public confidence, either in the intelligence or integrity of the government.

But we are not to rest upon presumption alone; we must bring these laws to the test of a severer scrutiny.

If they are void, it must be because the people of this state have alienated to the government of the *United States* their whole original power over the subject matter of the grant. No one can entertain a doubt of a competent power existing in the legislature, prior to the adoption of the federal constitution. The capacity to grant separate and exclusive privileges appertains to every sovereign authority. It is a necessary attribute of every independent government. All our bank charters, turnpike, canal and bridge companies, ferries, markets, &c. are grants of exclusive privileges for beneficial public purposes. These grants may possibly be inexpedient or unwise, but that has nothing to do with the question of constitutional right. The legislative power in a single, independent government, extends to every proper object of power, and is limited only by its own constitutional provisions, or by the fundamental principles of all government, and the unalienable rights of mankind. In the present case, the grant to the appellants took away no vested right. It interfered with no man's property. It left every citizen to enjoy all the rights of

*IN ERROR.*
......
ALBANY,
March, 1812.
~~~~~~~
LIVINGSTON
v.
VAN INGEN.

navigation, and all the use of the waters of this state which he before enjoyed. There was, then, no injustice, no violation of first principles, in a grant to the appellants, for a limited time, of the exclusive benefit of their own hazardous and expensive experiments. The first impression upon every unprejudiced mind would be, that there was justice and policy in the grant. Clearly, then, it is valid, unless the power to make it be taken away by the constitution of the *United States.*

We are not called upon to say affirmatively what powers have been granted to the general government, or to what extent. Those powers, whether express or implied, may be plenary and sovereign, in reference to the specified objects of them. They may even be liberally construed in furtherance of the great and essential ends of the government. To this doctrine I willingly accede. But the question here is, not what powers are granted to that government, but what powers are retained by this, and, particularly, whether the states have absolutely parted with their original power of granting such an exclusive privilege, as the one now before us. It does not follow, that because a given power is granted to congress, the states cannot exercise a similar power. We ought to bear in mind certain great rules or principles of construction peculiar to the case of a confederated government, and by attending to them in the examination of the subject, all our seeming difficulties will vanish.

When the people create a single, entire government, they grant at once all the rights of sovereignty. The powers granted are indefinite, and incapable of enumeration. Every thing is granted that is not expressly reserved in the constitutional charter, or necessarily retained as inherent in the people. But when a federal government is erected with only a portion of the sovereign power, the rule of construction is directly the reverse, and every power is reserved to the members that is not, either in express terms, or by necessary implication, taken away from them, and vested exclusively in the federal head. This rule has not only been acknowledged by the most intelligent friends to the constitution, but is plainly declared by the instrument itself. Congress have power to lay and collect taxes, duties and excises, but as these powers are not given exclusively, the states have a concurrent jurisdiction, and retain the same absolute powers of taxation which they possessed before the adoption of the constitution, except the power of laying an impost, which is expressly

taken away. This very exception proves that, without it, the *IN ERROR.*

......

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN. states would have retained the power of laying an impost; and it further implies, that in cases not excepted, the authority of the states remains unimpaired.

This principle might be illustrated by other instances of grants of power to congress with a prohibition to the states from exercising the like powers; but it becomes unnecessary to enlarge upon so plain a proposition, as it is removed beyond all doubt by the 10th article of the amendments to the constitution. That article declares that " the powers not delegated to the *United States* by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." The ratification of the constitution by the convention of this state, was made with the explanation and understanding, that " every power, jurisdiction and right, which was not *clearly* delegated to the general government, remained to the people of the several states, or to their respective state governments." There was a similar provision in the articles of confederation, and the principle results from the very nature of a federal government, which consists only of a defined portion of the undefined mass of sovereign power originally vested in the several members of the union. There may be inconveniences, but generally there will be no serious difficulty, and there cannot well be any interruption of the public peace, in the concurrent exercise of those powers. The powers of the two governments are each supreme within their respective constitutional spheres. They may each operate with full effect upon different subjects, or they may, as in the case of taxation, operate upon different parts of the same object. The powers of the two governments cannot indeed be supreme over each other, for that would involve a contradiction. When those powers, therefore, come directly in contact, as when they are aimed at each other, or at one indivisible object, the power of the state is subordinate, and must yield. The legitimate exercise of the constitutional powers of the general government becomes the supreme law of the land, and the national judiciary is specially charged with the maintenance of that law, and this is the true and efficient power to preserve order, dependence and harmony in our complicated system of government. We have, then, nothing to do, in the ordinary course of legislation, with the possible contingency of a collision, nor are we to embarrass ourselves in the anticipation of theoretical difficulties, than which nothing could, in general, be more fal-

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

lacious.   Such a doctrine would be constantly taxing our sagacity, to see whether the law might not contravene some future regulation of commerce, or some moneyed or some military operation of the *United States.*   Our most simple municipal provisions would be enacted with diffidence, for fear we might involve ourselves, our citizens and our consciences in some case of usurpation. Fortunately, for the peace and happiness of this country, we have a plainer path to follow.   We do not handle a work of such hazardous consequence.   We are not always walking *per ignes suppositos cineri doloso.*  Our safe rule of construction and of action is this, that if any given power was originally vested in this state, if it has not been exclusively ceded to congress, or if the exercise of it has not been prohibited to the states, we may then go on in the exercise of the power until it comes practically in collision with the actual exercise of some congressional power.   When that happens to be the case, the state authority will so far be controlled, but it will still be good in all those respects in which it does not absolutely contravene the provision of the paramount law.

This construction of the powers of the federal compact has the authority of Mr. *Hamilton.*  In the 32d number of the *Federalist,* he admits that all the authorities of which the states are not explicitly devested, remain with them in full vigour, and that in all cases in which it was deemed improper that a like authority with that granted to the union should reside in the states, there was the most pointed care in the constitution to insert negative clauses. He further states that there are only three cases of the alienation of the state sovereignty; 1. Where the grant to the general government is, in express terms, exclusive; 2. Where a like power is expressly prohibited to the states; and, 3. Where an authority in the states would be absolutely and totally contradictory and repugnant to one granted to the union; and it must be, he says, an immediate constitutional repugnancy that can, by implication, alienate and extinguish a pre-existing right of sovereignty.   The same view of the powers of the federal and state governments, and the same rules of interpretation, were given by him, in the discussions which the constitution underwent in our state convention, and they seem generally, if not unanimously, to have been acquiesced in by the members of that very respectable assembly.  (See the *Debates of the New-York Convention,* published by *Francis Childs.*)  These opinions may be regarded as the best evidence of the sense of the authors of that instrument, the best test of its

principles, and the most accurate cotemporary exposition to which we can recur.    For every one acquainted with the history of those times, well knows that the principles of the constitution, in the progress of its adoption through the *United States*, were discussed in the several conventions, and before the public, by men of the most powerful talents, and with the most animated zeal for the public welfare.    There were many distinguished individuals, and none more so than the one to whom I have referred, who had bestowed intense thought, not only upon the science of civil government at large, but who had specially and deeply studied the history and nature, the tendency and genius of the federal system of government, of which the *European* confederacies had given us imperfect examples, and to which system, as improved by more skilful artists, the destinies of this country were to be confided. Principles of construction solemnly sanctioned at that day, and flowing from such sources, are to be regarded by us, and by posterity, as coming in the language of truth, and with the force of authority.

I now proceed to apply these general rules to those parts of the constitution which are supposed to have an influence on the present question.

The provision that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states, has nothing to do with this case.    It means only that citizens of other states shall have equal rights with our own citizens, and not that they shall have different or greater rights.    Their persons and property must, in all respects, be equally subject to our law.  This is a very clear proposition, and the provision itself was taken from the articles of the confederation.    The two paragraphs of the constitution by which it is contended that the original power in the state governments to make the grant has been withdrawn, and vested exclusively in the union, are, 1. The power to regulate commerce with foreign nations, and among the several states ; and, 2. The power to secure to authors and inventors the exclusive right to their writings and discoveries.

1. *As to the power to regulate commerce.*

This power is not, in express terms, exclusive, and the only prohibition upon the states is, that they shall not enter into any treaty or compact with each other, or with a foreign power, nor lay any duty on tonnage, or on imports or exports, except what may be necessary for executing their inspection laws.    Upon the princi-

ples above laid down, the states are under no other constitutional restriction, and are, consequently, left in possession of a vast field of commercial regulation; all the internal commerce of the state by land and water remains entirely, and I may say exclusively, within the scope of its original sovereignty. The congressional power relates to external not to internal commerce, and it is confined to the *regulation* of that commerce. To what extent these regulations may be carried, it is not our present duty to inquire. The limits of this power seem not to be susceptible of precise definition. It may be difficult to draw an exact line between those regulations which relate to external and those which relate to internal commerce, for every regulation of the one will, directly or indirectly, affect the other. To avoid doubts, embarrassment and contention on this complicated question, the general rule of interpretation which has been mentioned, is extremely salutary. It removes all difficulty, by its simplicity and certainty. The states are under no other restrictions than those expressly specified in the constitution, and such regulations as the national government may, by treaty, and by laws, from time to time, prescribe. Subject to these restrictions, I contend, that the states are at liberty to make their own commercial regulations. There can be no other safe or practicable rule of conduct, and this, as I have already shown, is the true constitutional rule arising from the nature of our federal system. This does away all colour for the suggestion that the steam-boat grant is illegal and void under this clause in the constitution. It comes not within any prohibition upon the states, and it interferes with no existing regulation. Whenever the case shall arise of an exercise of power by congress which shall be directly repugnant and destructive to the use and enjoyment of the appellants' grant, it would fall under the cognisance of the federal courts, and they would, of course, take care that the laws of the union are duly supported. I must confess, however, that I can hardly conceive of such a case, because I do not, at present, perceive any power which congress can lawfully carry to that extent. But when there is no existing regulation which interferes with the grant, nor any pretence of a constitutional interdict, it would be most extraordinary for us to adjudge it void, on the mere contingency of a collision with some future exercise of congressional power. Such a doctrine is a monstrous heresy. It would go, in a great degree, to annihilate the legislative power of the states. May not the legislature declare that no bank paper shall

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

circulate, or be given or received in payment, but what originates from some incorporated bank of our own, or that none shall circulate under the nominal value of one dollar? But suppose congress should institute a national bank, with authority to issue and circulate throughout the union, bank notes, as well below as above that nominal value: This would so far control the state law, but it would remain valid and binding, except as to the paper of the national bank. The state law would be absolute, until the appearance of the national bank, and then it would have a qualified effect, and be good *pro tanto*. So, again, the legislature may declare that it shall be unlawful to vend lottery tickets, unless they be tickets of lotteries authorized by a law of this state, and who will question the validity of the provision? But suppose congress should deem it expedient to establish a national lottery, and should authorize persons in each state to vend the tickets, this would so far control the state prohibition, and leave it in full force as to all other lotteries. The possibility that a national bank, or a national lottery, might be instituted, would be a very strange reason for holding the state laws to be absolutely null and void. It strikes me to be an equally inadmissible proposition, that the state is devested of a capacity to grant an exclusive privilege of navigating a steam-boat, within its own waters, merely because we can imagine that congress, in the plenary exercise of its power to regulate commerce, may make some regulation inconsistent with the exercise of this privilege. When such a case arises, it will provide for itself; and there is, fortunately, a paramount power in the supreme court of the *United States* to guard against the mischiefs of collision.

The grant to the appellants may, then, be considered as taken subject to such future commercial regulations as congress may lawfully prescribe. Congress, indeed, has not any direct jurisdiction over our interior commerce or waters. *Hudson* river is the property of the people of this state, and the legislature have the same jurisdiction over it that they have over the land, or over any of our public highways, or over the waters of any of our rivers or lakes. They may, in their sound discretion, regulate and control, enlarge or abridge the use of its waters, and they are in the habitual exercise of that sovereign right. If the constitution had given to congress exclusive jurisdiction over our navigable waters, then the argument of the respondents would have applied; but the people never did, nor

IN ERROR.

......

ALBANY,
March, 1812.

LIVINGSTON,
v.
VAN INGEN.

ever intended, to grant such a power; and congress have concur-
rent jurisdiction over the navigable waters no further than may be
incidental and requisite to the due regulation of commerce be-
tween the states, and with foreign nations.

What has been the uniform, practical construction of this
power? Let us examine the code of our statute laws. Our
turnpike roads, our toll-bridges, the exclusive grant to run stage-
waggons, our laws relating to paupers from other states, our
*Sunday* laws, our rights of ferriage over navigable rivers and
lakes, our auction licenses, our licenses to retail spirituous liquors,
the laws to restrain hawkers and pedlars; what are all these
provisions but regulations of internal commerce, affecting as well
the intercourse between the citizens of this and other states, as
between our own citizens? So we also exercise, to a considerable
degree, a concurrent power with congress in the regulation of ex-
ternal commerce. What are our inspection laws relative to the
staple commodities of this state, which prohibit the exporta-
tion, except upon certain conditions, of flour, of salt provisions, of
certain articles of lumber, and of pot and pearl ashes, but regu-
lations of external commerce? Our health and quarantine laws,
and the laws prohibiting the importation of slaves are striking
examples of the same kind. So the act relative to the poor,
which requires all masters of vessels coming from abroad to re-
port and give security to the mayor of *New-York*, that the pas-
sengers, being aliens, shall not become chargeable as paupers,
and in case of default, making even the ship or vessel from which
the alien shall be landed liable to seizure, is another and very
important regulation affecting foreign commerce.

Are we prepared to say, in the face of all these regulations,
which form such a mass of evidence of the uniform construc-
tion of our powers, that a special privilege for the exclusive
navigation by a steam-boat upon our waters, is void, because it
may, by possibility, and in the course of events, interfere with
the power granted to congress to regulate commerce? Nothing,
in my opinion, would be more preposterous and extravagant.
Which of our existing regulations may not equally interfere with
the power of congress? It is said that a steam-boat may become
the vehicle of foreign commerce; and, it is asked, can then the en-
try of them into this state, or the use of them within it, be prohibit-
ed? I answer yes, equally as we may prohibit the entry or use of

slaves, or of pernicious animals, or an obscene book, or infec-
tious goods, or any thing else that the legislature shall deem noxious
or inconvenient. Our quarantine laws amount to an occlusion of the
port of *New-York* from a portion of foreign commerce, for several
months in the year; and the mayor is even authorized under those
laws to stop all commercial intercourse with the ports of any neigh-
bouring state. No doubt these powers may be abused, or exercised
in bad faith, or with such jealousy and hostility towards our neigh-
bours, as to call for some explicit and paramount regulation of con-
gress on the subject of foreign commerce, and of commerce be-
tween the states. Such cases may easily be supposed, but it is
not logical to reason from the abuse against the lawful existence of
a power; and until such congressional regulations appear, the le-
gislative will of this state, exercised on a subject within its origi-
nal jurisdiction, and not expressly prohibited to it by the consti-
tution of the *United States*, must be taken to be of valid and
irresistible authority.

2. If the grant is not inconsistent with the power of congress to
regulate commerce, there is as little pretence to hold it repugnant to
the power to grant patents. That power only secures, for a limited
time, to authors and inventors the exclusive privilege to their wri-
tings and discoveries; and as it is not granted, by exclusive words,
to the *United States*, nor prohibited to the individual states, it is
a concurrent power which may be exercised by the states, in a va-
riety of cases, without any infringement of the congressional power.
A state cannot take away from an individual his patent right, and
render it common to all the citizens. This would contravene the
act of congress, and would be, therefore, unlawful. But if an author
or inventor, instead of resorting to the act of congress, should
apply to the legislature of this state for an exclusive right to his
production, I see nothing to hinder the state from granting it, and
the operation of the grant would, of course, be confined to the
limits of this state. Within our own jurisdiction, it would be
complete and perfect. So a patentee under the act of congress
may have the time of his monopoly extended by the legislature of
any state, beyond the term of fourteen or twenty-eight years allowed
by that law. Congress may secure, for a limited time, an exclu-
sive right throughout the union; but there is nothing in the con-
stitution to take away from the states the power to enlarge the
privilege within their respective jurisdictions. The states are
not entirely devested of their original sovereignty over the sub-
ject matter; and whatever power has not been clearly granted to

*IN ERROR.*
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

*IN ERROR.*
.....
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

the union, remains with them. Again, the power granted to congress goes no further than to secure to the author or inventor a right of property, which, like every other species of property, must be used and enjoyed within each state, according to the laws of such state. The power of congress is only to ascertain and define the right of property; it does not extend to regulating the use of it. That must be exclusively of local cognisance. If the author's book or print contains matter injurious to the public morals or peace, or if the inventor's machine or other production will have a pernicious effect upon the public health or safety, no doubt a competent authority remains with the states to restrain the use of the patent right. That species of property must likewise be subject to taxation, and to the payment of debts, as other personal property. The national power will be fully satisfied, if the property created by patent be, for the given time, enjoyed and used exclusively, *so far* as under the policy of the several states the property shall be deemed fit for toleration and use. There is no need of giving this power any broader construction in order to attain the end for which it was granted, which was to reward the beneficent efforts of genius, and to encourage the useful arts.

If, then, the respondents were in possession of a patent for their steam-boat, as original inventors, our statute prohibition, not being made against the use of steam-boats, as *per se* injurious, would, possibly, before a competent tribunal, be obliged to yield to the patent right, as being founded on the paramount law.(*a*) But even this plea would not answer in this case; for if the respondents were in possession of such a patent, the state courts could not take notice of it. They cannot enforce a patent right, nor can they declare the patent void, if obtained by fraud or imposition. The acts of congress have vested the federal courts with the exclusive cognisance of all infringements of patent rights; and such was the opinion and decision of the supreme court of this state in a late case. (*Parsons v. Barnard*, 7 *Johns. Rep.* 144.) None of our courts could receive a plea of a patent right, in justification of a breach of the statutes: we should be obliged to send the party to the courts of the *United States*, in

(*a*) The *Chief Justice* requested it to be added, that the idea here intimated hypothetically, was not necessary to the argument, and, on more reflection, he thought that even that intimation might lead to error. He wished not to be understood as saying that a *state grant* could, in any case, or before any tribunal, be questioned or controlled by a patent right.

order to test the validity of his patent, and to seek the competent redress.

But the respondents show no patent, and the appellants have not obtained their grant, as *inventors* of the steam-boat, and, therefore, the privilege is totally unconnected with the patent power. It seems to be admitted that congress are authorized to grant patents only to the *inventor* of the useful art. The act of congress of 25th *February*, 1793, (*Laws United States*, v. 2. p. 200.) applies only to the inventor, and the applicant for the patent must make oath that he believes he is the true inventor or disco-verer of the art or improvement. The act of 22d *April*, 1800, (*Laws United States*, v. 5. p. 88.) extends the benefit of the former law to aliens, after two years' residence, on their making oath that such invention, art or discovery, hath not, to their belief, been known or used either in this or any foreign country. There can-not, then, be any aid or encouragement, by means of an exclusive right under the law of the *United States*, to importers from abroad of any useful invention or improvement. Such persons must resort to the patronage of the state governments, in which the power to reward their expensive and hazardous exertions was ori-ginally vested, and in which it still remains. The grant of 1798, was made to Chancellor *Livingston*, as " the *possessor* of a mode of applying the steam engine to propel a boat on new and advan-tageous principles." This power to encourage the importation of improvements, by the grant of an exclusive enjoyment, for a limited period, is extremely useful, and the *English* nation have long per-ceived and felt its beneficial effects. This will appear by a cur-sory view of the law of that country.

The creation of monopolies was anciently claimed and exercised as a branch of the royal prerogative. Lord *Coke* (3 *Inst.* 181.) defines a monopoly to be "an institution or allowance by the king's grant, for the sole using of any thing;" and he considers such royal grants to have been against the ancient and funda-mental laws of the realm. Parliament, at last, interposed to check the abuse of these grants, which had been issued, under *Elizabeth*, with inconsiderate profusion; and by the statute of 21 *Jac.* I. c. 3. commonly called the statute of monopolies, there were due limit-ations placed upon the exercise of this branch of the prerogative. That statute, by a general sweeping clause, demolished all the ex-isting monopolies that were not specially excepted; and some of those exceptions are worthy of our particular notice. In the first place, all grants of privileges by act of parliament were saved;

*IN ERROR.*

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

*IN ERROR.*

ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

for no one ever doubted (unless it be since the origin of this controversy) of the power of the legislature to create an exclusive privilege. The statute also allowed grants to be made for a limited time, by the authority of the crown, for the sole working or making of any new manufacture *not before used in the realm.* Upon this clause it has been held by such distinguished judges as *Holt* and *Pollexfen,* (2 *Salk.* 447.) that if the invention be new in *England,* a patent may be granted, though the thing was practised beyond sea before; for the statute, as they observe, intended to encourage new devices useful to the kingdom, *and whether learned by travel or by study, it is the same thing.* In the case of *Darcy* v. *Allen,* which arose under *Elizabeth,* before the statute of monopolies, (11 *Co.* 84. *Noy,* 273.) it was admitted, in the interesting argument on the part of the defendant, as preserved in *Noy,* (p. 182, 183.) that where any man, by *his own charge and industry,* or by his own wit or invention, doth bring any new trade into the realm, or any engine tending to the furtherance of a trade, that never was used before, and that for the good of the realm, the king might grant a monopoly patent. Thus, in 9 *Eliz.* there was a patent granted to *Hastings* for the sole making and selling for divers years, of *frisadors,* in consideration that he brought in the skill of making them *as they were made in Holland.* But in a suit on this patent, as it appeared that the defendant had used them before the patent, he was held not punishable for infringing the patent. So a like patent issued, in the beginning of the reign of *Elizabeth,* to one *Mathey,* for making certain knives with bone shafts, &c. on the suggestion that he brought the first use of them *from beyond sea,* but as the suggestion was false, he, on that ground alone, lost the benefit of his patent.

These cases clearly show that the uniform opinion, in *England,* both before and since the statute of *James,* has been, that imported improvements, no less than original inventions, ought to be encouraged by patent. And can we for a moment suppose that such a power does not exist in the several states? We have seen that it does not belong to congress, and if it does not reside in the states, it resides nowhere, and is wholly extinguished. This would be leaving the states in a condition of singular and contemptible imbecility. The power is important in itself, and may be most beneficially exercised for the encouragement of the arts; and if well and judiciously exerted, it may ameliorate the condition of society, by enriching and adorning the country with useful and elegant

improvements. This ground is clear of any constitutional diffi- *IN ERROR.*
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.
culty, and renders the argument in favour of the validity of the
statutes perfectly conclusive. And permit me here to add, that I
think the power has been wisely applied, in the instance before us,
to the creation of the privilege now in controversy. Under its
auspices the experiment of navigating boats by steam has been
made, and crowned with triumphant success. Every lover of
the arts, every patron of useful improvement, every friend to his
country's honour, has beheld this success with pleasure and admi-
ration. From this single source the improvement is progressively
extending to all the navigable waters of the *United States*, and it
promises to become a great public blessing, by giving astonishing
facility, despatch and safety, not only to travelling, but to the in-
ternal commerce of this country. It is difficult to consider even
the known results of the undertaking, without feeling a sentiment of
good will and gratitude towards the individuals by whom they have
been procured, and who have carried on their experiment with pa-
tient industry, at great expense, under repeated disappointments,
and while constantly exposed to be held up, as dreaming projectors,
to the *whips and scorns of time.* So far from charging the au-
thors of the grant with being rash and inconsiderate, or from wish-
ing to curtail the appellants of their liberal recompense, I think the
prize has been dearly earned and fairly won, and that the statutes
bear the stamp of an enlightened and munificent spirit.

If the legal right be in favour of the appellants, the remedy
prayed for by their bill is a matter of course. One of the learned
counsel for the respondents, with his usual frankness, seemed, in
a great degree, to concede this point.

Injunctions are always granted to secure the enjoyment of sta-
tute privileges of which the party is in the actual possession, un-
less the right be doubtful. This is the uniform course of the pre-
cedents. I believe there is no case to the contrary; and the deci-
sions in the *English* chancery, on this point, were the same before
as since the *American* revolution; and we are, consequently,
bound by them as a branch of the common law. It appears, by
the facts stated in the bill, and which we must take to be true, as
they have been sworn to, and are not answered or denied, that the
appellants had been, for three years, in the actual and exclusive
enjoyment of their statute privilege, when the respondents inter-
fered to disturb that right and that enjoyment.

It will be necessary to attend, for a moment, to the most promi-

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

nent *English* cases, on the subject of injunctions; and on this point I shall be very brief.

In *Gyles* v. *Wilcox and others*, which was as early as the year 1740, (2 *Atk.* 141. S. C. 3 *Atk.* 269.) there was a bill filed for an injunction to stay the printing of a book, on suggestion, that the book, pretending to be a different work, was, in truth, an invasion of the complainant's copyright, under the statute of *Anne*. The lord chancellor referred the cause, by consent, to arbitrators, to examine whether the one book was a copy from the other; and though that point was not clear, he allowed an injunction and continued it in the mean time. So, also, in the case of *Blackwell* v. *Harper*, in the year 1740, (2 *Atk.* 92.) a bill was exhibited to establish a right under the statute of 8 *Geo.* II. c. 13. for encouraging the arts of designing, engraving, &c. and to restrain the defendant from copying the complainant's engravings of medicinal plants, and an injunction was decreed, though the statute said nothing about an injunction, and had given, as against the offender, a forfeiture of the plates and sheets engraved, and an additional penalty of 5*s.* for every print, to be recovered by suit at law. In another case, in the same year, 1740, before the same chancellor, (1 *Ves.* 476.) he admitted, that when the right appeared by matter of record, or was grounded upon an act of parliament, it was a foundation for an injunction before answer. These cases I have particularly selected, because two of them were cases of injunction, founded on a statute right, and where the statute had also given a forfeiture, and because these cases were long before our revolution, and were the decisions of so correct and distinguished a chancellor as Lord *Hardwicke.*

It is impossible, in any cause, to produce cases more in point or more controlling; and they put the authority and duty to grant an injunction, in a case of clear statute right, beyond contradiction. There are many other cases in the *English* chancery, to the like effect, all of which I shall not stay to examine. (*Baskett* v. *Parsons*, 1718, decided by Sir *J. Jekyl*, and cited in 13 *Ves.* 493. *Smith* v. *Clark*, *Dick.* 455. *Hicks* v. *Raincock*, *Dick.* 647. *Pope* v. *Curl*, 2 *Atk.* 342. *Bell* v. *Walker and others*, 1 *Bro.* 451.) It will be sufficient, by referring to a few of them, to show the uniform language of the equity courts. The case of *The City of London* v. *Pughs* (3 *Bro. Ch. Cas.* 374.) arose as early as 1727, and as it was decided by the house of lords, upon an appeal, it merits the more attention. The ques-

tion there was, on a penalty given by a lease of 100*l*. an acre, for digging up the soil, and yet the court ordered that the chancellor issue an injunction until the hearing, to stay the trespass, notwith= standing the party had his remedy for the penalty. In the case of *Bolton* v. *Bull*, which was in chancery, as late as 1796, (3 *Ves.* 140.) there was a bill for an injunction against infringing a patent right for a fire engine, and it was granted, and the vali= dity of the patent was left, in the mean time, to be tried at law. It was there admitted to be the most ordinary jurisdiction of the court of chancery, not to alter the possession until the right was decided, and the party in enjoyment of his patent privilege was considered as in such possession. In a late case, before the present Lord Chancellor *Eldon*, (*The Universities* v. *Richardson*, 6 *Ves.* 707.) it was held, that in the case of a patent right, if the party gets his patent and puts it in execution, his possession, under colour of that title, is good enough to enjoin a disturber from interfering, and to continue the injunction until it is proved at law that he had no title. In a still later case, (14 *Ves.* 130.) the court expressed itself in strong terms against the invasion of a patent right, and said, that unless the injunction was granted, any person might violate the patent, and the consequence would be, that the patentee would be harassed with litigation.

I cite these latter cases to show that the law has been settled, in *England*, for the last 70 years at least, and has been preserved in a steady, uniform course, under a succession of their ablest and wisest men. The principle is, that statute privileges, no less than common law rights, when in actual possession and exercise, will not be permitted to be disturbed, until the opponent has fairly tried them at law, and overthrown their pretension. And is not this a most excellent principle, calculated to preserve peace, and order, and morals, in the community; and if it was not the law, yet deserving to be the law, and well worthy of our encouragement and sanction? The federal courts in this country have thought so; for under the patent law of congress, they have equally pro-tected the right by injunction. The case of *Morse* v. *Reid* was an injunction bill filed in 1796, to restrain the defendant from re-printing *Winterbotham's History*, which, the complainant alleged, was an invasion of the copyright of his *American Geography*. The propriety of the injunction was not questioned; it issued in the first instance. The complainant recovered 1,500 dollars,

IN ERROR.
······
ALBANY,
March, 1812.
⌒⌒⌒
LIVINGSTON
v.
VAN INGEN.

and the injunction was made perpetual.   So in the late case of *Whitney* v. *Fort*, which arose in *Georgia*, upon a violation of the complainant's patent for a machine for cleaning cotton, an injunction was granted, in the first instance, and was afterwards made perpetual, at the circuit court, at which Judge *Johnson* presided.   As far, then, as authority goes, it is in favour of the injunction, and if we are satisfied, in this case, of the appellants' right, we cannot hesitate about the remedy.   The act which the legislature passed at the last session, making it expressly the duty of the chancellor to grant an injunction as to all other boats except the two then built, proves very clearly the sense of the legislature that this was a fit and proper remedy in the case.   Those two boats were excepted out of the law, merely because it was improper to interfere with a pending suit, and the statute did not impair the pre-existing remedy by injunction; it only made it more clear and peremptory thereafter; and there is no reason why the injunction should issue against one set of boats, and not against another.

It would only be productive of litigation and mischief, to allow the respondents to continue the use of their boats, if the right be against them.   Their counsel admit that they must not only forfeit the boats, but must answer in damages for all the intermediate profits.   If the legal right be with the appellants, this is the proper court, and this is the proper time to declare it.   This court, from its peculiar constitutional structure, unites with it the highest court of common law, and nothing would be more useless than to withhold an injunction until the chancellor had sent the question to be tried at law, when the judges before whom it is to be tried, are members of this court, and have already declared their opinion.   The legal question can never be tried by a jury.   It is not a question of fact.   The single point is the constitutionality of the statutes.   That point never can be more fully and more ably argued than it has been before this court, and if we are of opinion that the acts are constitutional, they *must* be obeyed.   We are bound to cause them to be obeyed.   There is no escape from this duty.

If we refuse the injunction, it ought to be for some substantial reason.   We must not put it upon the mere *hoc volo, sic jubeo, sit pro ratione voluntas.*   There must be some solid principle, that will correspond with the character, as well as satisfy the conscience of this court.   If the laws are valid, it would be of per-

nicious consequence not to arrest the further progress of their violation. It is impossible for any act to be committed which attracts more universal notice, and if wrong and illegal, none which has a more fatal influence upon the general habits of respect and reverence for the legislative authority. The boats cannot run but in the face of day, and in the presence, as it were, of the whole people, whose laws are set at defiance, nor without seducing thousands, by the contagion of example, into an approbation and support of the trespass.

IN ERROR.
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

I am sensible that the case is calculated to excite sympathy. I feel it with others, and I sincerely wish that the respondents had brought the laws to a test, at less risk and expense; for every one who had eyes to read, or ears to hear the contents of our statute book, must have been astonished at the boldness and rashness of the experiment. But in proportion to the respectability and strength of the combination, should be the vigour of our purpose to maintain the law. If we were to suffer the plighted faith of this state to be broken, upon a mere pretext, we should become a reproach and a by-word throughout the union. It was a saying of *Euripides*, and often repeated by *Cæsar*, that if right was ever to be violated, it was for the sake of power. We follow a purer and nobler system of morals, and one which teaches us that right is never to be violated. This principle ought to be kept steadfast in every man's breast; and, above all, it ought to find an asylum in the sanctuary of justice.

I am accordingly of opinion, that the order of the court of chancery be reversed, and that an injunction be awarded.

LEWIS, Senator, and TOWNSEND, Senator, being related to some of the parties, declined giving any opinions.

The other senators declared their concurrence in the opinions delivered by the judges. The following order was, thereupon, unanimously adopted and directed to be entered:·

"Whereupon, after hearing counsel, as well for the appellants as for the respondents, upon the order of the court of chancery, complained of by the appellants, and considering and hereby declaring the exclusive privilege granted by the legislature of this state, to the appellants, as mentioned in their bill of complaint,

*March* 12th, 1812.

*IN ERROR.*
......
ALBANY,
March, 1812.

LIVINGSTON
v.
VAN INGEN.

valid, and that the same ought to be enjoyed by them according to law ;

" It is, therefore, ORDERED, ADJUDGED and DECREED, and this court doth, accordingly, ORDER, ADJUDGE and DECREE, that the order of the court of chancery complained of be *reversed.* And this court doth further ORDER, ADJUDGE and DECREE, that a writ of injunction issue, restraining and prohibiting the respondents from using and employing the boat or vessel, called the *Hope,* in the bill mentioned, on any of the waters of this state, in contravention of the legislative grant and privilege made to, and vested in, the appellants, as in their bill set forth; and that such injunction be continued until the final hearing of the cause in the court of chancery ; and that the injunction ought then to be made perpetual, so long as the exclusive right and privilege of the appellants shall continue under the acts of the legislature of this state, in the bill set forth; unless, on the final hearing of the cause, the equity contained in the appellants' bill shall be destroyed, by the new matter to be set forth and established by the respondents.

" And it is further ORDERED, ADJUDGED and DECREED, that the record be remitted to the court of chancery, to the end, that the order, judgment and decree, of this court, may be forthwith executed, by awarding such injunction."

Judgment of reversal.